**GOVERNMENT SUPPLIERS CONSOLIDATING SERVICES, INCORPORATED and Jack Castenova, Incorporated, Plaintiffs–Appellants, Cross–Appellees,**

v.

**Honorable Evan BAYH, Governor of the State of Indiana, and Honorable Kathy Prosser, Commissioner of the Indiana Department of Environmental Management, Defendants–Appellees, Cross–Appellants.**

Nos. 92–1318, 92–1515.

United States Court of Appeals, Seventh Circuit.

Argued April 27, 1992.

Decided Sept. 17, 1992.

Ronald J. Waicukauski, White & Raub, Indianapolis, Ind., Bruce L. Thall (argued), Abramson Freedman & Thall, Philadelphia, Pa., for plaintiffs-appellants.

Robert S. Spear, Chief Counsel, Office of Atty. Gen., Federal Litigation, Arend J. Abel, John R. Maley, Barnes & Thornburg, David F. Hamilton (argued), Rosemary G. Spalding, Indiana Dept. of Environmental Management, Indianapolis, Ind., for defendants-appellees.

Before CUMMINGS, EASTERBROOK, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The plaintiffs, who are brokers of municipal solid waste, arrange for trucks to haul

waste from temporary storage sites in New York, New Jersey, and Pennsylvania to landfills in Indiana. Seeking a declaratory judgment and injunctive relief, they brought suit in the United States District Court for the Southern District of Indiana to challenge the constitutionality, under the Commerce Clause, of Indiana statutes regulating the trucking of municipal waste. The district court upheld all but one of the provisions at issue, and the plaintiffs appeal. The defendants cross-appeal, challenging both the district court's determination that the plaintiffs had presented a controversy ripe for review and its determination as to the one provision struck down. For the reasons set forth in this opinion, we reverse in part and affirm in part.

## I

## BACKGROUND

### A. *The Challenged Provisions*

The plaintiffs challenge a set of statutory provisions regulating the transport and disposal of municipal waste in Indiana. According to the plaintiffs, the challenged provisions, which were enacted as a package in 1991, are aimed at reducing or eliminating, and will in fact reduce or eliminate, the disposal of out-of-state waste in Indiana.

### 1. The backhaul ban

Under Indiana Code § 13-7-31-13.1, trucks that are used to haul municipal waste to Indiana landfills or disposal facilities may be used to haul only a limited number of other items. The statute provides that "municipal waste collection and transportation vehicles"[1] may only be used to collect and transport the following:

(1) Municipal waste.

---

1. Such vehicles are defined in Ind.Code 13-7-31-3:

 Sec. 3. (a) As used in this chapter, a "municipal waste collection and transportation vehicle" means a truck or railroad car used to transport municipal waste from a solid waste generator or a solid waste processing facility to a:
 (1) solid waste processing facility in Indiana; or

(2) Special waste (as defined in 329 IC 2-2-1 as in effect January 1, 1990).

(3) Hazardous waste regulated under:
 (A) IC 13-7-8.5; or
 (B) the federal Solid Waste Disposal Act (42 U.S.C. 6901 et seq. as in effect January 1, 1990).

(4) Waste described under IC 13-1-12-9 that results from the combustion of coal.

(5) Material that is being transported to a facility, except an incinerator or a landfill, for reprocessing or reuse.

(6) Wood, concrete, brick, and other construction and demolition materials.

(7) Dirt, sand, gravel, asphalt, salt, and other highway maintenance material.

(8) Coal, gypsum, slag, scrap metal, and other bulk industrial commodities.

(9) Infectious waste (as defined under IC 16-1-9.7-3).

Ind.Code § 13-7-31-13.1. The practical impact of this law is to require the use of semi-dedicated fleets of trucks to haul garbage to Indiana. As the district court stated, if this provision is enforced, "a significant number of the remaining truckers now willing to haul trash to Indiana will become unwilling because they cannot afford to dedicate their trucks to so limited a range of payloads." No. 91 C 899, Order at 16 (R. 132) (Feb. 5, 1992).

### 2. Vehicle registration and stickering

■ Indiana enforces its backhaul ban by requiring that municipal waste collection and transportation vehicles be registered with the Indiana Department of Environmental Management, Ind.Code § 13-7-31-8, and bear identification stickers. Ind. Code § 13-7-31-8.2(d). The Department must issue the registration and identification stickers within thirty days after receipt of the application. Ind.Code § 13-7-

---

 (2) solid waste disposal facility in Indiana.
 (b) The term does not include a vehicle that is
 (1) used to transport municipal waste from a residence if the vehicle is owned, leased or operated by an individual who lives in the residence; or
 (2) not used for commercial solid waste transportation.

31–8(d). The registration must be renewed every two years, Ind.Code § 13–7–31–8.1(a), and the fee for registration or renewal is $100.[2] Ind.Code § 13–7–31–16.-1(a)(1). A person who owns, leases, or operates more than one municipal waste collection and transportation vehicle need obtain only one registration listing all such vehicles. Ind.Code § 13–7–31–8.2(a). A copy of the current registration must be carried by each vehicle at all times. Ind. Code § 13–7–31–8.2(c). All vehicles must bear stickers:

> Vehicle identification stickers provided by the department, indicating that the vehicle carries municipal waste, must be affixed adhesively at all times in a prominent location on each side of each registered municipal waste collection and transportation vehicle's cargo compartment or, at the option of the person to whom the registration is issued, on each side of a truck cab of a vehicle.

Ind.Code § 13–7–31–8.2(d). Landfills are not permitted to accept a shipment of municipal waste if the vehicle carrying it does not have a vehicle identification sticker properly affixed. Ind.Code § 13–7–31–14(1).

**2.** These fees are used to implement the waste disposal regulatory system to which registrants are subject. They do not revert to the state general fund. *See* Ind.Code § 13–7–31–16.5. Since their purpose is regulatory rather than revenue-raising, our jurisdiction over plaintiffs' challenge to them is not affected by the Tax Injunction Act, 28 U.S.C. § 1341. *See Miami Herald Pub. Co. v. City of Hallandale,* 734 F.2d 666, 670–71 (11th Cir.1984); *Schneider Transp., Inc. v. Cattanach,* 657 F.2d 128, 132 (7th Cir. 1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982).

**3.** The disposal fees, like the registration fee, are to defray the administrative and regulatory costs of Indiana's waste management program, which regulates the activities of the appellants. *See* Ind.Code § 13–9.5–5–1; Appellees' Br. at 70. Therefore our jurisdiction over the plaintiffs' challenge to them is proper. *See, supra,* note 2.

**4.** Ind.Code § 13–9.5–5–1 provides:

> Sec. 1. (a) Beginning January 1, 1991, a fee is imposed on the disposal or incineration of solid waste in a final disposal facility in Indiana. Except as provided in section 6 of

**3.** Surety bond and disposal fees [3]

Indiana law also provides that "nonresident operators," that is, brokers like the appellants, managers of transfer stations, or transporters of municipal waste, who are not residents of Indiana, must post a surety bond with the Indiana Department of Environmental Management. Ind.Code § 13–7–10.5–15. This provision is intended to "ensure the collection and payment of any civil penalties that the operator may be required to pay in Indiana because of the solid waste transfer activities of the operator." Ind.Code § 13–7–10.5–15(1)(B). The amount of the surety bond and the time for payment are to be determined under rules adopted by the Solid Waste Management Board. Ind.Code § 13–7–10.5–15(1)(A). Such rules have not yet been adopted. In addition, the nonresident operator is "considered to appoint the Secretary of State as the operator's agent for purposes of service of process in connection with any matter involving solid waste transfer activities." Ind.Code § 13–7–10.5–15(2).

Lastly, the appellants challenge Indiana's disposal fees. Indiana Code § 13–9.5–5–1 provides not only for fees that apply uniformly to all waste, regardless of origin, but also for fees that apply only to waste generated outside Indiana.[4] These latter

> this chapter, the amount of the fee is as follows:
> (1) For solid waste generated in Indiana and delivered to a final disposal facility in a motor vehicle having a registered gross vehicle weight greater than nine thousand (9,000) pounds, fifty cents ($0.50) a ton.
> (2) For solid waste generated outside Indiana and delivered to a final disposal facility in a motor vehicle having a registered gross vehicle weight greater than nine thousand (9,000) pounds:
> (A) fifty cents ($0.50) a ton; and
> (B) if the solid waste management board has adopted rules under subsection (b), an additional amount imposed under the rules.
> (3) For solid waste generated in Indiana or outside Indiana and delivered to a final disposal facility in a motor vehicle having a registered gross vehicle weight of not more than nine thousand (9,000) pounds or in a passenger motor vehicle (as defined in IC 9–13–2–123), fifty cents ($0.50) for each load delivered by the motor vehicle.
> (b) The solid waste management board shall adopt rules to establish and impose a fee on the disposal or incineration of solid waste:

fees are to be determined by rules to be adopted by the Solid Waste Management Board, and "shall be set at an amount necessary to offset the costs incurred by the state or a county, municipality, or township that can be attributed to the importation of the solid waste into Indiana and the presence of the solid waste in Indiana." Ind.Code § 13–9.5–5–1(b). Rules have not yet been adopted.[5]

### B. *Facts*

We give the facts as found by the district court. Indiana is an economically favorable disposal site for municipal waste from other regions of the United States. Indiana's first attempt to regulate the hauling of waste into Indiana was declared unconstitutional under the Commerce Clause in 1990. *See Government Suppliers Consolidating Serv., Inc. v. Bayh*, 753 F.Supp. 739 (S.D.Ind.1990). After this ruling, which was not appealed, Indiana enacted new provisions regulating the disposal of municipal waste. Those provisions are the ones at issue in the present case. The primary target of the provisions is a practice known as backhauling or crosshauling.

Truckers who haul municipal waste from the eastern United States to the Midwest normally are engaging in backhauling or crosshauling. The truckers haul goods from the Midwest to New York, New Jersey, or Pennsylvania; these trips (known as fronthauls) are a trucker's main source of income. Instead of returning to the Midwest with empty trucks, they haul back trash for disposal in midwestern landfills.

Trash collected in eastern cities is stored temporarily in transfer and recycling stations. At these stations, the waste is compacted and bound into large bundles. Brokers (like the appellants) identify truckers looking for backhauls of trash and arrange a pick-up for them from a transfer station and also arrange for disposal of the trash in a landfill in Indiana (or another midwestern state). Flatbed trailers, box-type semi trailers, and open-top dump trailers are used to carry the trash to Indiana. An individual trucker may haul waste to Indiana only once in several years or may haul waste regularly. The brokers do not have long-term contracts with truckers; arrangements for transport of each load of waste are made on an ad hoc, one-time basis.

Many customers of trucking companies refuse to load their goods onto any vehicle that has hauled municipal waste. As the appellants candidly conceded before the district court, trucking companies would prefer that their other customers remain unaware that their trailers have hauled municipal waste. Order at 32. Evidence at trial showed that even commercial entities that are not involved in food products do not want their products transported in trucks that previously hauled trash. These shippers were concerned about potential adverse effects on product reputation. Order at 27. Shippers, apparently thinking that if a truck is very clean it must have been recently washed after hauling garbage, have rejected trucks because they are too clean. As the district court noted,

(1) generated outside Indiana; and
(2) in a final disposal facility in Indiana; necessary to offset the costs incurred by the state or a county, municipality, or township that can be attributed to the importation of the solid waste into Indiana and the presence of the solid waste in Indiana.
(c) Revenue from fees collected under subsection (a)(1) and (a)(2)(A) shall be deposited in the state solid waste management fund established under section 2 of this chapter. Revenue from fees collected under subsection (a)(2)(B) shall be deposited in the hazardous substances response trust fund established by IC 13–7–8.7, except that any portion of the revenue that the solid waste management board finds is necessary to offset costs incurred by counties, municipalities, and town-

ships shall be distributed to solid waste management districts (as defined in IC 13–9.5–1–10) pro rata on the basis of the district's population.
(d) If solid waste has been subject to a fee under this section, the total amount of the fee paid shall be credited against any other fee to which the solid waste may later be subject under this section.

5. The district court's ruling upholding a third provision against plaintiffs' facial challenge has not been challenged on appeal. That provision required uniform inspection of in-state and out-of-state transfer stations that receive waste destined for final disposal in Indiana. *See* Ind. Code § 13–7–10.5–16.

"this illustrates that shippers are more concerned with reputation than with the actual health risks." Order at 27 n. 10. One trucker testified in the district court that he would not voluntarily tell a shipper that a trailer had previously hauled trash because of the stigma attached to crosshauling. Order at 32. However, in spite of pressure from shippers not to haul waste, "it is also clear that many truckers, especially small operators, are still willing to crosshaul trash. If the questioned provisions are enforced, then a significant number of the remaining truckers now willing to haul trash to Indiana will become unwilling because they cannot afford to dedicate their trucks to so limited a range of payloads." Order at 16.

The district court found that, unlike out-of-state waste, "Indiana-generated municipal waste generally is not cross-hauled—that is, trash is usually shipped intrastate in traditional, dedicated garbage trucks, not dry vans." Order at 25.

Today a broker must pay a trucker approximately $35 a ton for hauling municipal waste from New York to Indiana. If a dedicated fleet of garbage trucks is used, the cost will double to about $70 a ton. Including a typical Indiana tipping fee of $15 per ton (the disposal fee that must be paid to the landfill), the total disposal cost of crosshauled trash is approximately $50 a ton. If a dedicated fleet is used, the total cost for disposing of New York waste in Indiana will be $85 a ton.[6] At $85 a ton, Indiana will no longer be the most economically reasonable state for the disposal of trash. According to the testimony of the brokers, transfer stations will not pay $85 a ton to dispose of waste; thus the backhauling ban, if enforced, will eliminate interstate transport of waste to Indiana. Order at 28.

## C. District Court Proceedings

The district court first determined that the plaintiffs' challenges to all of the provisions described above were properly before

it. It then examined the constitutionality of the prohibition on backhauling and the registration/stickering provisions as applied. The district court determined that the backhaul ban was facially neutral and applied identically to similarly situated waste haulers, regardless of their residence and the origin of the waste they carried. Therefore, it evaluated its constitutionality under the standard enunciated in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), noting that, under this standard, "a statute will not be held unconstitutional unless the burden imposed on commerce is clearly excessive in relation to the local benefits." Determining that the putative local benefits (protection of health and of the reputation of Indiana products) justified the burden on interstate commerce (lower profits for waste haulers), the court upheld the statute.

The district court also upheld the registration and stickering provisions. Noting that the statute does not distinguish on its face between local trash haulers and national waste disposal companies, the district court also found that it did not discriminate in practical effect. Moreover, the court noted, "there is no evidence that an Indiana entity will benefit economically from the registration/stickering provision so it does not constitute economic protectionism." Order at 31. According to the district court, the primary local benefit of the statute was to assist Indiana in enforcing its backhauling prohibitions. Also, registration and stickering would promote private enforcement of the backhauling ban: "All sides agree that if shippers see the stickers, they will probably not use the truck. Thus, crosshauling will be effectively eliminated by private enforcement." Order at 31. The court rejected the plaintiffs' arguments that "sticker stigma" was a burden on interstate commerce; rather, it noted, "the dormant Commerce Clause does not give trucking companies a constitutional right to conceal information from their customers." Order at 32. In addi-

---

**6.** This is still less expensive than disposing of waste in eastern landfills, which costs about $125 a ton.

tion, the district court stated that, while "there [was] no doubt that enforcement of the vehicle registration greatly w[ould] change how the plaintiffs do business," Order at 33, the Commerce Clause does not protect a particular method of doing business. Lastly, the court rejected the plaintiffs' assertions that the registration and stickering requirements were duplicative and ineffective.

The district court reviewed the remaining two provisions at issue here, the disposal fee and surety bond, for facial validity. It upheld the disposal fee provision; however, it struck down the surety bond provision as an unnecessary burden on interstate commerce, noting that other provisions of the Indiana Code require out-of-state operators to register with the Indiana Department of Environmental Management, and that the registration process "should provide the state with all information it requires to adequately effectuate its judgments." Order at 40.

### D. *Contentions of the Parties*

Government Suppliers and Castenova submit that the district court erred in upholding the backhaul ban, the registration and stickering provisions, and the disposal fees to be imposed on out-of-state waste. They contend that the court should have examined the backhaul ban and the registration and stickering provisions under what they denominate the *"per se"* test, that is, the elevated scrutiny applied by the Supreme Court where the statute in question is discriminatory on its face or in practical effect. *See, e.g., Brown–Forman Distillers v. New York State Liquor Auth.*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).

In a cross-appeal, Indiana submits that the plaintiffs' challenge to the backhauling ban should be dismissed for lack of a case or controversy and that the plaintiffs' challenges to the surety bond and the disposal fee are not ripe for judicial resolution, because as yet no implementing rules have been adopted. They also appeal the district court's determination that the provision requiring out-of-state operators to post a surety bond is invalid under the Commerce Clause.

## II

### JURISDICTION

■ "The appropriate test to determine if there is an actual controversy, one ripe for decision, under the Declaratory Judgment Act is the one stated in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 [61 S.Ct. 510, 85 L.Ed. 826] (1941)." *Oneida Tribe of Indians v. State of Wisconsin*, 951 F.2d 757, 760 (7th Cir. 1991) (citing *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972)). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment." *Maryland Casualty*, 312 U.S. at 273, 61 S.Ct. at 512. Indiana submits that the district court erred in finding that it had subject matter jurisdiction over the claims asserted by Government Suppliers and Castenova. It argues that, in challenging the backhaul ban, the plaintiffs have presented "no concrete, justiciable controversy." Appellees' Br. at 41. We find little merit in Indiana's arguments on this point. Jurisdiction is clearly proper as to the backhaul ban and the registration and stickering provisions that accompany it. The plaintiffs do not themselves engage in backhauling; their business consists in arranging for others to do so. It is undisputed that their business would suffer severe adverse effects from enforcement of the backhaul ban. Such economic injury, though indirect, is sufficient to confer standing. *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The interest they seek to vindicate is within the zone of interests protected by the Commerce Clause. *See Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 320–21 n. 3, 97 S.Ct. 599, 602–03 n. 3, 50 L.Ed.2d 514

(1977); *Bacchus Imports Ltd. v. Dias,* 468 U.S. 263, 267, 104 S.Ct. 3049, 3055, 82 L.Ed.2d 200 (1984).

Indiana's contention that the plaintiffs presented only an abstract, and therefore unripe, question appears to rest on the assertion that the plaintiffs did not specify what sorts of goods they claim the "Constitution mandates be allowed to travel in municipal waste vehicles, and under what circumstances." Appellees' Br. at 43. "In sum, Plaintiffs have asked the Court for a broad advisory opinion that they (or more precisely, the trucking companies with whom they do business) can haul in trash trucks a broad range of goods, the specifics of which the Court can only guess." *Id.* However, as will become clear in our discussion, the legal issue presented "is one the resolution of which would be essentially unaffected by further factual development." *Peick v. Pension Benefit Guar. Corp.,* 724 F.2d 1247, 1261 (7th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984). The case presents "a substantial controversy between parties having adverse interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Lake Carriers' Ass'n v. MacMullan,* 406 U.S. at 506, 92 S.Ct. at 1755.

■ The ripeness for facial review of the surety bond provision and the disposal fees is a closer question. The implementing regulations have not yet been written or adopted. However, as the Supreme Court stated in *Pacific Gas & Electric Co. v. State Energy Resource Conservation & Development Commission,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1721, 75 L.Ed.2d 752 (1983), "[o]ne does not have to await the consummation of threatened injury to obtain preventative relief." In order to protect against a feared future event, "the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Salvation Army v. Department of Community Affairs,* 919 F.2d 183, 192 (3d Cir.1990) (quoting *Steffel v. Thompson,* 415 U.S. 452, 460, 94

S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974)). When "present harms will flow from the threat of future actions," *Armstrong World Industries, Inc. v. Adams,* 961 F.2d 405, 412 (3d Cir.1992), those present harms may mean a controversy is ripe for review. *See Volvo N. Am. Corp. v. Men's Int'l Professional Tennis Council,* 857 F.2d 55, 63–64 (2d Cir.1988) ("the prospect or fear of future events may have a real impact on present affairs, such that a preemptive challenge is ripe").

The district court found, based on defendants' own affidavits, that Indiana intends to enforce the surety bond provision and disposal fee provision once enabling rules are promulgated, and that enforcement would affect the plaintiffs' businesses. And, according to the plaintiffs, these statutes, though not yet enforced, have an immediate damaging effect on their businesses. As Judge Tinder recognized in the earlier case between the parties, "advance planning required for the interstate shipment of solid waste could well be impaired by the fear of increased future costs." *Government Suppliers Consol. Serv., Inc. v. Bayh,* 734 F.Supp. 853, 861 (S.D.Ind. 1990). Moreover, faced with future enforcement of provisions which, as the district court recognized, might eliminate disposal of out-of-state waste in Indiana, the appellants "are now incurring increased costs and diminution of revenues and profits based upon the need to secure and use disposal sites outside of the State of Indiana." Appellants' Combined Reply Br./Answering Br. at 12. In some cases, the absence of implementing regulations may render the actual effect of the statute too uncertain to make review possible. *See MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986) ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes."); *Nixon v. Administrator of Gen. Serv.,* 433 U.S. 425, 438, 97 S.Ct. 2777, 2788, 53 L.Ed.2d 867 (1977) ("For [the Court] to review regulations not yet promulgated, the final form of which has been only hinted at, would be wholly novel."). In the present case, however,

what the statutes authorize is clear; only procedures and amounts are uncertain. There is no need to wait for regulations or specific applications to evaluate and make a conclusive determination as to the legal issue presented. *See Pacific Gas & Elec. Co.*, 461 U.S. at 201, 103 S.Ct. at 1720; *Armstrong World Indus.*, 961 F.2d at 412. The provisions are ripe for review.

## III

## ANALYSIS

■ The Commerce Clause not only gives the Congress the power to regulate, through the use of its legislative power, commerce among the states, but also limits the power of the states, even in the absence of federal legislation, to burden interstate commerce. *See Cooley v. Board of Wardens*, 12 How. 299, 13 L.Ed. 996 (1851). In *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535–36, 57 L.Ed.2d 475 (1978), Justice Stewart, writing for the Court summarized this latter aspect of the Commerce Power and the need for "delicate adjustment of the conflicting state and federal claims" [7]:

> Although the Constitution gives Congress the power to regulate commerce among the States, many subjects of potential federal regulation under that power inevitably escape congressional attention "because of their local character and their number and diversity." *South Carolina State Highway Dept. v. Barnwell Bros., Inc.*, 303 U.S. 177, 185 [58 S.Ct. 510, 514, 82 L.Ed. 734]. In the absence of federal legislation, these subjects are open to control by the States so long as they act within the restraints imposed by the Commerce Clause itself. *See Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440 [98 S.Ct. 787, 793, 54 L.Ed.2d 664]. The bounds of these restraints appear nowhere in the words of the Commerce Clause, but have emerged gradually in the decisions of this Court giving effect to its basic purpose. That broad purpose was well ex-

pressed by Mr. Justice Jackson in his opinion for the Court in *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 537–538 [69 S.Ct. 657, 664–665, 93 L.Ed. 865]:

> "This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units. As the Court said in *Baldwin v. Seelig*, 294 U.S. [511], 527 [55 S.Ct. 497, 502, 79 L.Ed. 1032], 'what is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation.'"

The opinions of the Court through the years have reflected an alertness to the evils of "economic isolation" and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people. Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected.

The jurisprudence of this "dormant" or "negative" Commerce Power described by Justice Stewart is the product of the inevitable tension between the need to preserve the capacity of the country to address national economic concerns and the need of state government to exercise its residual police powers for the betterment and protection of its citizens. It should not be surprising, therefore, that litigation in this area often centers on areas of acute economic and social concern where the interests of preserving the national capacity to act and of allowing state government to solve local problems is particularly urgent. Consequently, in these last decades of the twentieth century, environmental problems have produced heightened concerns about waste management, and garbage has become a frequent focal point of dormant commerce power jurisprudence.

---

7. *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 553, 69 S.Ct. 657, 679, 93 L.Ed. 865 (1949)

(Black, J., dissenting).

Garbage is, under the prevailing case law of the Supreme Court, indisputably an article of commerce, and " 'States are not free from constitutional scrutiny when they restrict' " its interstate movement. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources,* — U.S. —, — n. 3, 112 S.Ct. 2019, 2023 n. 3, 119 L.Ed.2d 139 (1992) (quoting *Philadelphia v. New Jersey,* 437 U.S. at 622–23, 98 S.Ct. at 2534–35). States faced with increased and rising waste volumes and foreseeable shortages of landfill space have attempted by various statutory means to slow down or halt the inflow of waste from other states where disposal costs are higher. In *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, the Supreme Court struck down a New Jersey law that, with a few minor exceptions, prohibited the importation of "solid or liquid waste which originated or was collected outside the territorial limits of the state." [8] More recently, in *Fort Gratiot,* — U.S. —, 112 S.Ct. 2019, and *Chemical Waste Management, Inc. v. Hunt,* — U.S. —, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992), the Court struck down Michigan and Alabama laws that discriminated against interstate commerce in trash. In these cases, the Court reaffirmed the basic principle behind *Philadelphia v. New Jersey:* one state may not "isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *Philadelphia v. New Jersey,* 437 U.S. at 628, 98 S.Ct. at 2538; *see Chemical Waste,* — U.S. at —, 112 S.Ct. at 2012; *Fort Gratiot,* — U.S. at —, 112 S.Ct. at 2024.

## A. *The Backhaul Ban, Registration, and Stickering*

■ The heart of the Indiana regulatory scheme under review is the so-called backhaul ban and its attendant registration and stickering provisions. Our evaluation of these provisions requires that we set forth in more detail the principles developed by the Supreme Court to guide dormant Commerce Clause analysis. As the Court ex-

plicitly noted in *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986), there are two alternate analytical perspectives for problems under the dormant Commerce Clause. The "critical consideration" in determining the appropriate analysis "is the overall effect of the statute on both local and interstate activity." *Brown–Forman Distillers,* 476 U.S. at 579, 106 S.Ct. at 2084.

Under the first test, a statute "which clearly discriminates against interstate commerce is unconstitutional 'unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.' " *Fort Gratiot,* — U.S. at — –—, 112 S.Ct. at 2023–24 (quoting *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 274, 108 S.Ct. 1803, 1808, 100 L.Ed.2d 302 (1988)). By contrast, under the second test (the *Pike* test), if a statute is neutral on its face, has only indirect or incidental effects on interstate commerce, and regulates evenhandedly, the statute will be upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Under the *Pike* test, if a legitimate local purpose is "credibly advanced," *Chemical Waste,* — U.S. at — n. 5, 112 S.Ct. at 2014 n. 5 (quoting *Philadelphia v. New Jersey,* 437 U.S. at 624, 98 S.Ct. at 2535), "then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847.

The district court applied the lesser level of scrutiny enunciated in *Pike.* It reasoned that the statutes under review were "facially neutral," that they "treat[ ] similarly situated waste haulers alike, regardless of their residence or the origin of the wastes

---

8. Of course, the Commerce Clause also protects against a state's discriminatory attempt to restrict the outflow of trash. *See Stephen D. De-*

*Vito, Jr. Trucking, Inc. v. Rhode Island Solid Waste Management Corp.,* 770 F.Supp. 775, 780 (D.R.I.), *aff'd,* 947 F.2d 1004 (1st Cir.1991).

they carry. Neither intrastate nor interstate waste haulers may crosshaul municipal waste and any non-exempt item." Order at 25. The district court rejected the plaintiffs' argument that the backhaul ban was discriminatory because it affected primarily interstate haulers of waste (Indiana-generated waste generally is not crosshauled, but usually shipped intrastate in traditional, dedicated garbage trucks). In the district court's view, the plaintiffs' argument boiled down to an assertion that the statute would apply most often to out-of-state entities, and that circumstance alone did not render the statute discriminatory. Order at 25 (citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88, 107 S.Ct. 1637, 1649, 95 L.Ed.2d 67 (1987); *see Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496 (7th Cir.), *cert. denied*, 493 U.S. 955, 110 S.Ct. 367, 107 L.Ed.2d 353 (1989)).

■ However, a determination that a statute does not discriminate on its face and "purports to regulate evenhandedly" does not end the question of which scrutiny should apply. *See Brimmer v. Rebman*, 138 U.S. 78, 11 S.Ct. 213, 34 L.Ed. 862 (1891). When a statute discriminates "in practical effect" against interstate commerce, the fact that it purports to apply equally to citizens of all states does not save it. In *Brimmer*, the Court struck down a Virginia statute requiring that fresh meat brought from more than 100 miles away from the place of sale had to be inspected and imposing a significant inspection fee on the seller of the meat. Recently, in *Fort Gratiot*, the Supreme Court set forth approvingly the *Brimmer* Court's analysis:

> This statute [cannot] be brought into harmony with the Constitution by the circumstance that it purports to apply alike to the citizens of all the States, including Virginia; for 'a burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the States, including the people of the State enacting such statute.' *Minnesota v. Barber*, [136 U.S. 313, 10 S.Ct. 862, 34 L.Ed. 455 (1890)]; *Robbins v. Shelby*

*Taxing District*, 120 U.S. 489, 497 [7 S.Ct. 592, 596, 30 L.Ed. 694]. *If the object of Virginia had been to obstruct the bringing into that State, for use as human food, of all beef, veal and mutton, however wholesome, from animals slaughtered in distant States, that object will be accomplished if the statute before us be enforced.*

*Brimmer v. Rebman*, 138 U.S. 78, [83], 11 S.Ct. 213, 214, 34 L.Ed. 862 (1891) (as quoted by *Fort Gratiot*, —— U.S. at ——, 112 S.Ct. at 2025) (emphasis added); *see also Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951).

■ In the case before us, Indiana has not "artlessly disclosed an avowed purpose to discriminate," *Dean Milk*, 340 U.S. at 354, 71 S.Ct. at 298, and therefore, to determine what level of scrutiny to apply, we must examine the practical effect of the statutes in question on interstate commerce. Indiana argues that the district court was correct in applying the *Pike* test—that the backhaul ban and its accompanying registration and stickering provisions are facially non-discriminatory, regulate evenhandedly, and have only incidental effects on interstate commerce.

As the Supreme Court has noted, the "critical consideration is the *overall* effect of the statute on both local and interstate activity," *Brown–Forman*, 476 U.S. at 573, 106 S.Ct. at 2081 (emphasis added), and whether the "effect is to favor in-state economic interests over out-of-state economic interests." *Id.* Furthermore, "when considering the purpose of a challenged statute, [the] Court is not bound by '[t]he name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law." *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).

The appellants characterize the statutes' effects on interstate commerce as incidental; in fact, the "circumstances of enactment suggest that it was the principal objective" of the statutes to impede importa-

tion of trash. *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 39, 100 S.Ct. 2009, 2017, 64 L.Ed.2d 702 (1980). Nonetheless, we need not ascribe a motive of economic protection to the Indiana legislature in order to determine that the statute is discriminatory. The "evils of economic protectionism can reside in legislative means as well as legislative ends." *Philadelphia v. New Jersey,* 437 U.S. at 626, 98 S.Ct. at 2537. In this regard, we cannot agree with Indiana's characterization of the effects of the statutes as merely incidental. The practical impact of the backhaul ban would be to reduce very significantly the inflow of out-of-state waste by raising the cost of disposing of such waste in Indiana: the district court found that the fee paid to a trucker to haul waste doubles if a dedicated fleet is used. Discrimination may take the form of "raising the costs of doing business" for out-of-state entities, "while leaving those of their [in-state] counterparts unaffected." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 351, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977) (determining that a facially neutral statute was discriminatory). Because Indiana waste is usually transported in dedicated garbage trucks, intrastate transportation of waste remains unaffected. Like the North Carolina apple producers in *Hunt,* those engaged in intrastate waste disposal have not been forced to alter their business practices in order to comply with the statute, *see id.,* while those engaged in hauling out-of-state waste will have to change drastically their method of operation or give up hauling waste into Indiana altogether.

It is true, as the defendants point out, that the Commerce Clause does not "protect[ ] the particular structure or methods of operation in a retail market." *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 127, 98 S.Ct. 2207, 2215, 57 L.Ed.2d 91 (1978). However, in *Exxon,* the Court was dealing with a statute that "ha[d] no demonstrable effect whatsoever on the interstate flow of goods." *Id.* at 126, 98 S.Ct. at 2214. As the Court stated in *Exxon,* while some interstate refiners might "choose to withdraw entirely from the Ma-

ryland market," there was "no reason to assume that their share of the entire supply [of out-of-state gas sold in Maryland] will not be promptly replaced by other interstate refiners." Here, in contrast, with the raised cost for transport, Indiana has in effect erected an economic barrier against the importation of municipal waste. Indeed, as the district court found, if the backhaul ban is enforced, "a significant number of the remaining truckers now willing to haul trash to Indiana will become unwilling because they cannot afford to dedicate their trucks to so limited a range of payloads." Order at 16. Although waste undoubtedly will continue to be exported from New York, New Jersey, and Pennsylvania, it will be diverted from Indiana to states where disposal costs, unaffected by a backhaul ban or other protectionist legislation, will now be lower than in Indiana.

■ In short, because these provisions discriminate in practical effect against interstate commerce, they are subject to the higher level of scrutiny, and the appellees bear the burden of demonstrating that the provisions "further health and safety concerns that cannot be adequately served by nondiscriminatory alternatives." *Fort Gratiot,* —— U.S. at ——, 112 S.Ct. at 2027.

Indiana claims that the backhaul ban serves substantial interests in public health and commercial reputation. It asserts that the ban on backhauling will prevent the risk of contamination of products which might result from being carried in trucks that have previously carried municipal waste. Although Indiana concedes that the evidence it presented at trial focused on possible contamination of food-stuffs (and its ban on transport of food in vehicles that have carried waste, codified at Ind.Code § 16–1–28–13.5, is not challenged here), it asserts that there is a danger to the public from contamination of other goods as well. In evaluating Indiana's asserted interest in protecting public health, we note first that Indiana produced the slightest of evidence before the district court that health risks are actually posed by the practice of

crosshauling.[9] It did not demonstrate that such risks, if they do exist, could not be avoided by means less drastic than the outright ban on backhauling. Indeed, the district court did not find that less discriminatory alternative methods were not available. The district court wrote, "The plaintiffs argue that cleaning is effective and sufficient. Maybe the plaintiffs are correct." Order at 26. Secondly, the effectiveness of Indiana's backhaul ban in furthering the goals Indiana asserts is questionable at best: Trucks that have carried waste to neighboring states are not prevented from picking up goods in Indiana. *Cf. Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 444–45, 98 S.Ct. 787, 795–96, 54 L.Ed.2d 664 (1978) (not deferring to state safety regulations that did not serve stated goals). Thirdly, we note that Indiana is not acting to protect its own citizens' health by this ban. *Cf. CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 93, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987) ("Indiana has no interest in protecting nonresident shareholders *of nonresident corporations.*"); *Edgar v. MITE Corp.,* 457 U.S. 624, 644, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982) ("State has no legitimate interest in protecting nonresident shareholders"). The goods that are crosshauled with garbage are goods destined for consumption in the eastern United States, not in Indiana.[10] This does not mean that Indiana has no interest in preventing contamination of such goods, but it does change the nature of Indiana's interest. The primary interest that Indiana is advancing is its interest in protecting the commercial reputation of goods manufactured in Indiana: this reputation will be tarnished if Indiana goods, contaminated during shipment, adversely affect the health of their users. Indiana's interest in the commercial reputation of Indiana goods is a legitimate local interest. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 143, 90 S.Ct. 844, 848, 25 L.Ed.2d 174 (1970). However, given the little evidence Indiana provided concerning health risks posed by backhauling, we must conclude that Indiana has failed to carry its burden of demonstrating that there is a realistic possibility that Indiana goods will actually be contaminated and that contamination will adversely affect their reputation.

However, Indiana also asserts another aspect of its interest in its commercial reputation. It argues that, whether or not backhauling actually poses health risks, the reputation of Indiana goods is tarnished because of the public's distaste, rational or irrational, for the practice. It argues that the backhaul ban is thus necessary to protect the reputation of its goods, even if there is no health risk whatsoever. Such an interest, an interest in catering to consumer preferences, is hardly deserving of the same deference that would be owed to significant health and safety concerns. Moreover, even if we assume the legitimacy of this state interest, before the district court Indiana argued that "any shortage of trucks willing to haul trash to Indiana [was] due to pressure that shippers put on truckers not to crosshaul waste, and not on [sic] its statutory restrictions." Order at 16. The district court noted that "the evidence indicates that several trucking companies have semi-voluntarily discontinued their waste hauling activities because shippers told them to." *Id.* Thus it appears that market forces alone will operate adequately to protect Indiana's interests. In light of our conclusion that the backhaul ban, registration, and stickering provisions are actually discriminatory and in light of Indiana's failure to demonstrate the necessity of the measures and the absence of less discriminatory alternatives, the conclusion is inevitable that Indiana's backhaul ban and registration and stickering program are unconstitutional under the Com-

---

**9.** In its brief, Indiana concedes that the record before the court discloses no confirmed cases of illness even from crosshauling food and garbage, much less garbage and other goods. Appellees' Br. at 32.

**10.** Although apparently Indiana garbage occasionally (though rarely) is carried in "dry vans" to Indiana landfills, the appellees do not direct our attention to any evidence in the record that these trucks (or any other trucks affected by the statute) then transport consumer goods destined for purchase and use by Indiana citizens.

merce Clause. They are "an obvious effort to saddle those outside the State with the entire burden of slowing the flow of refuse in to [its] remaining landfill sites." *Philadelphia v. New Jersey*, 437 U.S. at 629, 98 S.Ct. at 2538.

## B. Registration and Stickering as Independent Regulatory Devices

█ Indiana's registration and stickering provisions are part and parcel of its backhaul ban. Their primary purpose, as Indiana concedes, is to facilitate enforcement of the backhaul ban. To the extent they are linked to the backhaul ban, they fall with it. However, Indiana asserts that it has other interests furthered by the registration and stickering provisions. Namely, it submits that these provisions protect the customers of truckers from deception and misrepresentation concerning the use to which a truck previously has been put. A state's interest in preventing consumer fraud and deception is a legitimate one. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). And in Indiana's case, it is also a real one: trucking companies admittedly do not want to reveal to their customers that a truck has been used to haul waste. However, the sticker does not notify customers effectively whether a truck has carried waste; it notifies customers and the public that, at sometime in the past, perhaps many months before, the truck has carried waste *into Indiana*. A truck that dropped off waste in a neighboring state, even the day before, may pick up any goods in Indiana without a sticker. Thus, Indiana's backhaul ban is limited by the specific terms of the statute to trucks carrying waste to Indiana landfills and disposal facilities. The ban does not extend to trucks that drop off waste in other states.

Indiana stated at oral argument that there is difficulty in developing an enforceable and administrable system that can monitor what trucks have hauled and disposed of in other states, but it conceded that nothing in the record supported that contention. Moreover, we note that Indiana's statute regulating the transportation of food in trucks that have previously carried garbage is not by its terms limited to trucks that have carried garbage *to Indiana*. *See* Ind.Code § 16-1-28-13.5. Nevertheless, Indiana also asserts that the registration and stickering program will assist it in enforcing this unchallenged ban on crosshauling food and garbage. However, because trucks that have carried waste to other states have no stickers, the utility of the registration and stickering provisions for this purpose is limited. In addition, trucks are prohibited from hauling food for only fourteen days after a garbage haul. *See* Ind.Code § 16-1-28-13.5. Because the sticker does not give the date of the last garbage haul, its utility is even further limited. Thus, Indiana's statute will not be effective in providing information on the truck's past haulage; it will merely divert the flow of waste from Indiana.

The registration fee in itself raises a financial barrier around the State. For Indiana garbage trucks, which, as the district court found, are dedicated garbage trucks engaging solely in the hauling of waste, the per-haul cost of the registration fee will be small. For the truck that hauls garbage only occasionally, the per-haul cost of the registration fee will be many times the cost to a hauler of in-state waste. Indeed, the district court noted that for trucks that haul trash to Indiana only once a year, the $100 registration fee may be prohibitive. Order at 33. In practical effect, the registration fee is thus like the *discriminatory* taxes and license fees struck down by the Court in a series of cases culminating in *American Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987). In *Scheiner*, the Supreme Court struck down Pennsylvania "axle taxes," stating that "in practical effect, since they impose a cost per mile on appellants' trucks that is approximately five times as heavy as the cost per mile borne by local trucks, the taxes are plainly discriminatory." *Scheiner*, 483 U.S. at 286, 107 S.Ct. at 2841 (citing *Sprout v. City of South Bend*, 277 U.S. 163, 170, 48 S.Ct. 502, 504, 72 L.Ed. 833

(1928) (striking down a "flat tax, substantial in amount and the same for busses plying the streets continuously in local service and for busses making, as do many interstate busses, only a single trip daily")). The Court explained that the axle taxes, as unapportioned flat taxes, penalized some interstate commerce:

> Whether the full brunt, or only a major portion, of their burden is imposed on the out-of-state carriers, their inevitable effect is to threaten the free movement of commerce by placing a financial barrier around the State of Pennsylvania. To pass the "internal consistency" test, a state tax must be of a kind that, "if applied by every jurisdiction, there would be no impermissible interference with free trade." *Armco Inc. v. Hardesty*, 467 U.S. [638], 644 [104 S.Ct. 2620, 2623, 81 L.Ed.2d 540 (1984)]. If each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred.

*Scheiner*, 483 U.S. at 284, 107 S.Ct. at 2840. According to the *Scheiner* Court, its ruling and other recent Supreme Court cases "repeat[ed] a theme that recurred in an early series of decisions invalidating facially neutral taxes on nonresident solicitors, or 'drummers,' seeking to engage in business within the taxing jurisdiction." *Id.* at 281 n. 12, 107 S.Ct. at 2839 n. 12. One such case, relied upon by *Scheiner*, is *Nippert v. City of Richmond*, 327 U.S. 416, 427–29, 66 S.Ct. 586, 591–93, 90 L.Ed. 760 (1946). In *Nippert*, the Court struck down an annual licensing fee, imposed on in-state and out-of-state salespersons, because the license, which was required

whether the "solicitor" engaged in regular business or in a single act of business, "inherently bore no relation to the volume of business done or of returns from it." *Nippert*, 327 U.S. at 427, 66 S.Ct. at 591. Moreover, the licensing fee "impose[d] substantial excluding and discriminatory effects of its own": "the small operator particularly and more especially the casual or occasional one from out of the State will find the tax not only burdensome but prohibitive, with the result that the commerce is stopped before it is begun." *Id.* at 429, 66 S.Ct. at 592. If other states were to adopt registration fees similar to Indiana's, the divisive and disruptive effect on interstate commerce in municipal waste would be magnified.[11]

Indiana conceded in the district court that the statute was aimed at eliminating the practice of making impromptu contracts to haul trash, Order at 33, but argues, as it also argued concerning the backhaul ban, that the registration provisions merely affect the plaintiffs' methods of operation, and that the Commerce Clause does not protect a business's methods of operation or market structure. However, again we are forced to conclude that *Washington State Apple*, not *Exxon*, is the controlling precedent here. *Cf. Nippert*, 327 U.S. at 429, 66 S.Ct. at 592 (striking down license fee which "the small operator particularly and more especially the casual or occasional one from out of the State will find ... not only burdensome but prohibitive"). Many of the larger trucking companies have already voluntarily discontinued the practice of backhauling municipal waste. The registration and stickering provisions, with their prohibitive effect on

---

11. *See American Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 285, 107 S.Ct. 2829, 2841, 97 L.Ed.2d 226 (1987):

> Although the actual imposition of flat taxes by other jurisdictions is not necessary to sustain the Commerce Clause challenge to Pennsylvania's flat taxes under the 'internal consistency' test, the adoption of these flat taxes by other jurisdictions even before the Pennsylvania suits were resolved surely suggests that acquiescence in these flat taxes would occasion manifold threats to the national free trade area.... Such taxes can obviously divide and

disrupt the market for interstate transportation services.

As *Scheiner* notes, flat-rate license taxes, "'if adopted by many cities and states, bear much more heavily in the aggregate on a firm that *sells in many places* than on a firm otherwise identical (and in particular, with the same total quantity of sales) that sells in only one place.'" *Id.* at n. 20 (quoting Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 Mich.L.Rev. 1091, 1188 (1986)).

the smaller or casual operator, will effectively block the remaining avenues for the importation of waste.

## C. *Tipping Fees and Surety Bond*

### 1. Tipping fees

▌ As we noted above in our description of Indiana's statutes, Indiana Code § 13–9.5–5–1 provides for a per-ton fee on municipal waste disposed of in Indiana facilities. It also provides for an additional fee for waste originating outside of Indiana. This additional fee is challenged by appellants as unconstitutional on its face. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

"[A] state tax which burdens interstate commerce is not *per se* invalid because it burdens interstate commerce since interstate commerce may constitutionally be made to pay its way." [12] *Maryland v. Louisiana*, 451 U.S. 725, 754, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576 (1981). "The State's right to tax interstate commerce is limited, however, and no state tax may be sustained unless the tax: (1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the State." *Id.* "A state tax must be assessed in light of its actual effect considered in conjunction with other provisions of the State's tax scheme." *Id.* at 756, 101 S.Ct. at 2134. "The concept of a compensatory tax first requires identification of the burden for which the State is attempting to compensate." *Id.* at 758, 101 S.Ct. at 2135. In the present case, Indiana argues that its statute authorizing additional tipping fees for out-of-state waste is justified because it "merely offsets what would otherwise be a subsidy for interstate commerce" and "requires out-of-state haulers to shoulder their fair share of in-state administrative costs." Appellees' Br. at 70. According to Indiana, the "statute simply authorizes the Solid Waste Management Board to adopt rules imposing fees on trash generated outside Indiana in an amount 'necessary to offset' governmental costs attributed to the importation of such waste." Indiana argues that "at present, the State and local governments, and thus Indiana taxpayers, bear the cost of regulating solid waste disposal and long-term clean-ups in Indiana." Appellees' Br. at 70. It argues that "once this additional burden to the State is identified (as it will be in rulemaking), the State is 'constitutionally permitted to level the playing field.'" *Id.* We note that Indiana makes no argument that municipal waste and the risks it presents vary with its ori-

---

**12.** Although a similar fee was at issue in *Chemical Waste Management*, the constitutionality of that fee hinged on the state's admitted purpose (to slow the volume of waste coming into its Emelle facility); because the fee would act to reduce only the volume of out-of-state waste, rather than curtail volume from all sources, the fee was impermissible. *See Chemical Waste*, — U.S. at —, 112 S.Ct. at 2015. In *Chemical Waste*, the Court did not consider the argument made here by Indiana, noting that Alabama presents no argument here, as it did below, that the additional fee makes out-of-state generators pay their "fair share" of the costs of Alabama waste disposal facilities, or that the additional fee is justified as a 'compensatory tax.' The Trial Court rejected these arguments, finding that the former was foreclosed by *American Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 287–289 [107 S.Ct. 2829, 2842–2843], and the latter to be factually unsupported by a requisite "substantially equiva-

lent" tax imposed solely on in-state waste, as required by, e.g., *Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 242–44 [107 S.Ct. 2810, 2817–18].... *Id.,* — U.S. at — n. 9, 112 S.Ct. at 2016 n. 9. Chief Justice Rehnquist approved logic like Indiana's in his dissent. *See Chemical Waste*, at —, 112 S.Ct. at 2018 (Rehnquist, C.J., dissenting) ("Alabama's general tax revenues presumably already support the State's various inspection and regulatory efforts designed to ensure the Emelle facility's safe operation. Thus, Alabamans will be made to pay twice, once through general taxation and a second time through a specific disposal fee."). Justice White, however, in the majority opinion in *Chemical Waste*, suggested that a generally applicable per-ton additional fee on *all* hazardous waste disposed of within Alabama would be a nondiscriminatory alternative to differential fees. *See Chemical Waste*, at —, 112 S.Ct. at 2015.

gin. Such an argument, if factually supported, might justify a higher fee for out-of-state waste. *See Chemical Waste,* ——U.S. at —— – ——, 112 S.Ct. at 2014–15; *Fort Gratiot,* —— U.S. at ——, 112 S.Ct. at 2027 ("[O]ur conclusion would be different if the imported waste raised health or other concerns not presented by Michigan waste."); *National Solid Waste Management Ass'n v. Voinovich,* 959 F.2d 590, 593–94 (6th Cir.1992) (vacating summary judgment and remanding to give Ohio opportunity to prove that out-of-state waste contained higher percentage of hazardous waste and that therefore higher fee was justified). In short, while Indiana wishes to use general public revenues to support Indiana users of landfills, it intends to impose a user fee on interstate users.

The problem with Indiana's argument is that it would allow a state to tax interstate commerce more heavily than in-state commerce anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds. We find no support in the caselaw for such a result.[13] As the Court noted in *Maryland v. Louisiana,* 451 U.S. at 759, 101 S.Ct. at 2135, "[t]he common thread running through the cases upholding compensatory taxes is the equality of treatment between local and interstate commerce." "[A] State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *American Trucking Ass'ns, Inc. v. Scheiner,* 483 U.S. 266, 280, 107

S.Ct. 2829, 2838, 97 L.Ed.2d 226 (1987) (quoting *Armco Inc. v. Hardesty,* 467 U.S. 638, 642, 104 S.Ct. 2620, 2622, 81 L.Ed.2d 540 (1984)). "Equal treatment for in-state and out-of-state taxpayers similarly situated" has been a condition precedent for a valid tax. *Halliburton Oil Well Cementing Co. v. Reily,* 373 U.S. 64, 70, 83 S.Ct. 1201, 1204, 10 L.Ed.2d 202 (1963). There is no such equality here: the Indiana statute imposes a tax on haulers of waste who cross the state line, while sparing haulers of waste who remain entirely within the state.[14] *See Tyler Pipe Industries v. Dept. of Revenue,* 483 U.S. 232, 244–45, 107 S.Ct. 2810, 2818–19, 97 L.Ed.2d 199 (1987).

Moreover, as the appellants point out, the statute not only allows the state to impose an additional tipping fee on out-of-state waste, it provides for additional fees to offset costs incurred by "a county, municipality or township that can be attributed to the importation of the solid waste into Indiana." Ind.Code § 13–9.5–5–1(b). However, these subdivisions of the state may not impose the additional fee on in-state waste originating outside the subdivision, even though the same costs are presumably incurred and not paid by the Indiana citizens to whom they are attributable. This favoring of in-state interests is no more permissible when carried out by a subdivision of the state than when carried out by the state itself. *See Fort Gratiot,* —— U.S. at ——, 112 S.Ct. at 2024 ("[A] State may not avoid the strictures of the

---

**13.** *Cf.* Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause,* 84 Mich.L.Rev. 1091, 1120 n. 59 (1986) (discussing "revenue-tariffs"):

Will someone object that the revenue is not raised at foreign expense because the tariff is paid by local actors such as importers and ultimately paid by the local consumer? This overlooks the fact that in the final analysis the burden is almost certainly shared by all parties, including producers. And the point of the discriminatory aspect of the tariff is to see that insofar as the burden of the tariff is borne by producers, it is borne by foreign producers and not by local. The only way to de-emphasize this purpose to externalize a part of the revenue burden is to deemphasize the revenue aspect of the tariff entirely. But then the point of the tariff must be to shift

business from foreign producers to local. In short, we are looking once again at a classical protectionist tariff.

*But see Chemical Waste,* —— U.S. at ——, 112 S.Ct. at 2018 (Rehnquist, C.J., dissenting) ("Alabama's general tax revenues presumably already support the State's various inspection and regulatory efforts designed to ensure the Emelle facility's safe operation. Thus, Alabamans will be made to pay twice, once through general taxation and a second time through a specific disposal fee.").

**14.** We do not deal here, of course, with a situation where the state itself has chosen to operate in the marketplace and, in that capacity, to subsidize its own residents. *See Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980).

Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself."). We see no possibility for the defect to be corrected by regulations to be adopted to implement the statute. The provision is unconstitutional.

2. Surety bond

■ As noted above, the district court ruled that Indiana's surety bond provision violated the Commerce Clause. Indiana challenges that ruling in its cross-appeal. Like the disposal fee provision, the surety bond requirement is discriminatory on its face: only out-of-state operators are required to post bond. Therefore, the surety bond is subject to the higher level of scrutiny applied to facially discriminatory statutes, and "is unconstitutional 'unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.'" *Fort Gratiot*, at —— – ——, 112 S.Ct. at 2023–24 (quoting *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 274, 108 S.Ct. 1803, 1808, 100 L.Ed.2d 302 (1988)). Indiana argues that the surety bond provision is necessary to "facilitate the collection of fines and penalties from nonresidents." Appellees' Br. at 72. It asks the court to take judicial notice of the fact that "it costs more to collect a judgment from a nonresident" and that "such costs are unique to nonresidents." *Id.*

We fail to see any justification for taking judicial notice. Indiana has made no showing that problems in collecting penalties and fines from nonresidents are in fact greater than in collecting from residents. More fundamentally, Indiana has made no showing whatsoever that nondiscriminatory alternatives are not available. Moreover, Indiana's surety bond will erect a barrier to the importation of out-of-state waste as surely as will its registration fee. The district court found that many of the smaller operators, who remain willing to haul trash into Indiana, would find the registration fee prohibitive. For these operators, the surety bond would clearly be prohibitive as well. Moreover, because the surety bond is imposed merely on the basis

of nonresidency of the operator, it will also erect a barrier against nonresidents who wish to engage in intrastate waste disposal. Such a barrier, unless justified by a substantial reason for differentiating between residents and nonresidents, would be forbidden under the Privileges and Immunities Clause. *See Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 280, 105 S.Ct. 1272, 1276, 84 L.Ed.2d 205 (1985) (quoting *Toomer v. Witsell*, 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948)). Indiana's surety bond provision imposes a discriminatory burden on interstate commerce and is unconstitutional under the Commerce Clause.

D. *The Pike Test*

■ We have determined that Indiana's statutes do not survive the elevated scrutiny given to legislation that unambiguously discriminates against interstate commerce. So weak is the rationale offered by Indiana, that even when the statutes are examined under the *Pike* test, the same result is reached. As we noted above, under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), if a statute is neutral on its face, has only indirect or incidental effects on interstate commerce, and regulates evenhandedly, the statute will be upheld "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." If a legitimate goal is "credibly advanced," *Chemical Waste*, —— U.S. at —— n. 5, 112 S.Ct. at 2014 n. 5, "then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. Although *Pike* sometimes is understood to authorize a "general-purpose balancing," *Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496, 505 (7th Cir.1989), in fact the Court has taken a "decidedly confined view of the judicial role: 'We are not inclined "to second-guess the empirical judgments of lawmakers concerning the utility of legislation."'" *Id.* (quoting *CTS Corp. v. Dy-*

*namics Corp. of America,* 481 U.S. 69, 92, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987) (quoting *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 679, 101 S.Ct. 1309, 1321, 67 L.Ed.2d 580 (1981) (Brennan, J., concurring in judgment)). The Court has been particularly reluctant to pass on the wisdom of legislation touching upon health and safety. *See, e.g., Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (plurality opinion). Nonetheless, the "incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack. Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause." *Id.* (citing *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978)). In the present case, Indiana has asserted its interest in health, commercial reputation, and preventing consumer deception. As we noted above, Indiana's asserted health concerns are actually an interest in its commercial reputation; and, in serving its interest in its commercial reputation, Indiana is bowing to unreasoned public opinion. Moreover, as we noted, because trucks that have carried waste to any neighboring state may pick up Indiana goods and carry them out of state, Indiana's statutes will further their stated purposes only marginally. Truckers could still deceive shippers and still haul Indiana goods in trucks that have carried garbage. A State's interest in its commercial reputation or in preventing consumer deception will not always outweigh the national interest in the free flow of commerce under the *Pike* test. *See Pike,* 397 U.S. at 146, 90 S.Ct. at 849; *Real Silk Hosiery Mills v. City of Portland,* 268 U.S. 325, 336, 45 S.Ct. 525, 526, 69 L.Ed. 982 (1925). The burden imposed on the free flow of commerce by the Indiana statutes is heavy— the district court found that, if enforced, the statutes at issue here would effectively bar the importation of out-of-state waste into Indiana. This burden is clearly excessive in relation to the putative local bene-fits of the statutes. Indiana's statutes must fall even under the *Pike* test.

### Conclusion

For the foregoing reasons, that portion of the judgment of the district court finding constitutional Indiana's backhaul ban, registration and stickering requirements, and disposal fees is reversed. The district court's judgment finding Indiana's surety bond provision unconstitutional is affirmed. The appellants-cross appellees may recover their costs in this court.

AFFIRMED IN PART AND REVERSED IN PART.