OCONOMOWOC RESIDENTIAL
PROGRAMS, INC., a domestic
corporation, Plaintiff,

v.

CITY OF GREENFIELD, a municipal
corporation, and Village of Greendale,
a municipal corporation, Defendants.

No. 96–C–1112.

United States District Court,
E.D. Wisconsin.

Sept. 30, 1998.

John F. Maloney, Mark A. Peterson, McNally, Maloney & Peterson, Milwaukee, WI; Dennis M. Burg, General Counsel, Oconomowoc Residential Programs, Inc., Oconomowoc, WI, for plaintiff.

Raymond J. Pollen, Crivello, Carlson, Mentkowski & Steeves; Milwaukee, WI; Roger C. Pyzyk, Pyzyk Law Office, West Allis, WI; James Burns, Burns Law Office, Greendale, WI, for defendant.

### DECISION AND ORDER

CURRAN, District Judge.

Oconomowoc Residential Programs, Inc. (ORP) is suing the City of Greenfield (Wisconsin) and the Village of Greendale (Wisconsin) for violating its rights under the Fair Housing Amendment Act of 1988, 42 U.S.C. §§ 3601–3631, the Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213, and the Equal Protection Clause of the Four-

teenth Amendment.[1] *See* U.S. Const. Amend XIV. The Plaintiff is asking for compensatory damages, attorney fees, costs and an order permanently enjoining the Defendants from reviewing its licensure. The Defendants have answered and denied liability. This court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 & 1343 and 42 U.S.C. §§ 3613 & 12133.

At the scheduling conference, the parties agreed that cross motions for summary judgment could resolve all the issues in this case. Despite this agreement, the Plaintiff filed a motion seeking only a partial summary judgment on liability. That motion and the Defendants' motion for summary judgment on all claims and issues have now been fully briefed.

### I. RELEVANT STATUTES

#### A. WISCONSIN

Because the interplay of the Wisconsin statutory zoning scheme with the federal Fair Housing Amendment Act and Americans With Disabilities Act is central to this litigation, the court will set out the relevant statutes in full. The crux of the Plaintiff's case is its challenge to the validity of Subsections 62.23(7)(i)1 & 2r of the Wisconsin Statutes. These subsections are found in Chapter 62 ("Cities") of the Wisconsin Statutes.[2] Chapter 62's Subchapter I ("General Charter Law") contains Section 62.23 ("City Planning") which authorizes such municipal powers as planning, zoning, inspection, condemnation and land acquisition. Subsection 62.23(7)(i) provides that:

(i) Community and other living arrangements. For purposes of this section, the location of a community living arrangement, as defined in s. 46.03(22), a foster home, as defined in s. 48.02(6), a treatment foster home, as defined in s. 48.02(17q), or an adult family home, as defined in s. 50.01(1), in any city shall be subject to the following criteria:

---

1. Because a statute of the State of Wisconsin has been attacked as "preempted" or "invalid" in this case, the court notified the Attorney General of the State of Wisconsin and invited the State to intervene. *See* 28 U.S.C. § 2403(b). The State declined to intervene in this case.

2. Wis.Stat. § 62.23 is made applicable to villages such as Greendale by Wis.Stat. § 61.35.

1. No community living arrangement may be established after March 28, 1978 within 2,500 feet, or any lesser distance established by an ordinance of the city, of any other such facility. Agents of a facility may apply for an exception to this requirement, and such exceptions may be granted at the discretion of the city. Two community living arrangements may be adjacent if the city authorizes that arrangement and if both facilities comprise essential components of a single program.

2. Community living arrangements shall be permitted in each city without restriction as to the number of facilities, so long as the total capacity of such community living arrangements does not exceed 25 or one percent of the city's population, whichever is greater. When the capacity of the community living arrangements in the city reaches that total, the city may prohibit additional community living arrangements from locating in the city. In any city of the 1st, 2nd, 3rd or 4th class, when the capacity of community living arrangements in an aldermanic district reaches 25 or one percent of the population, whichever is greater, of the district, the city may prohibit additional community living arrangements from being located within the district. Agents of a facility may apply for an exception to the requirements of this subdivision, and such exceptions may be granted at the discretion of the city.

2m. A foster home or treatment foster home that is the primary domicile of a foster parent or treatment foster parent and that is licensed under s. 48.62 or an adult family home certified under s. 50.032(1m)(b) shall be a permitted use in all residential areas and is not subject to subds. 1 and 2 except that foster homes and treatment foster homes operated by corporations, child welfare agencies, churches, associations or public agencies shall be subject to subds. 1 and 2.

2r. a. No adult family home described in s. 50.01(a)(b) may be established within 2,500 feet, or any lesser distance established by an ordinance of the city, of any other adult family home described in s. 50.01(1)(b) or any community living arrangement. An agent of an adult family home described in s. 50.01(1)(b) may apply for an exception to this requirement, and the exception may be granted at the discretion of the city.

b. An adult family described in s. 50.01(1)(b) that meets the criteria specified in subd. 2r.a. and that is licensed under s. 50.033(1m)(b) is permitted in the city without restriction as to the number of adult family homes and may locate in any residential zone, without being required to obtain special zoning permission except as provided in subd. 9.

3. In all cases where the community living arrangement has capacity for 8 or fewer persons being served by the program, meets the criteria listed in subds. 1. and 2., and is licensed, operated or permitted under the authority of the department of health and family services, that facility is entitled to locate in any residential zone, without being required to obtain special zoning permission except as provided in subd. 9.

4. In all cases where the community living arrangement has capacity of 9 to 15 persons being served by the program, meets the criteria listed in subds. 1. and 2., and is licensed, operated or permitted under the authority of the department of health and family services, that facility is entitled to locate in any residential area except areas zoned exclusively for single-family or 2-family residences except as provided in subd. 9., but is entitled to apply for special zoning permission to locate in those areas. The city may grant such special zoning permission at its discretion and shall make a procedure available to enable such facilities to request such permission.

5. In all cases where the community living arrangement has capacity for serving 16 or more persons, meets the criteria listed in subds. 1. and 2., and is licensed, operated or permitted under the authority of the department of health and family services, that facility is entitled to apply for special zoning permission to locate in areas zoned for residential use. The city may grant such special zoning permission at its discretion and shall make a proce-

dure available to enable such facilities to request such permission.

6. The department of health and family services shall designate a single subunit within the department to maintain appropriate records indicating the location and number of persons served by each community living arrangement, and such information shall be available to the public.

7. In this paragraph, "special zoning permission," includes but is not limited to the following: special exception, special permit, conditional use, zoning variance, conditional permit and words of similar intent.

8. The attorney general shall take all necessary action, upon the request of the department of health and family services, to enforce compliance with this paragraph.

9. Not less than 11 months nor more than 13 months after the first licensure of an adult family home under s. 50.033 or of a community living arrangement and every year thereafter, the common council of a city in which a licensed adult family home or a community living arrangement is located may make a determination as to the effect of the adult family home or community living arrangement on the health, safety or welfare of the residents of the city. The determination shall be made according to the procedures provided under subd. 10. If the common council determines that the existence in the city of a licensed adult family home or a community living arrangement poses a threat to the health, safety or welfare of the residents of the city, the common council may order the adult family home or community living arrangement to cease operation unless special zoning permission is obtained. The order is subject to judicial review under s. 68.13, except that a free copy of the transcript may not be provided to the adult family home or community living arrangement. The adult family home or community living arrangement must cease operation within 90 days after the date of the order, or the date of final judicial review of the order, or the date of the denial of special zoning permission, whichever is later.

9m. The fact that an individual with acquired immunodeficiency syndrome or a positive test for the presence of HIV, as defined in s. 252.01(1m), antigen or nonantigenic products of HIV or an antibody to HIV resides in a community living arrangement with a capacity for 8 or fewer persons may not be used under subd. 9 to assert or prove that the existence of the community living arrangement in the city poses a threat to the health, safety or welfare of the residents of the city.

10. A determination made under subd. 9 shall be made after a hearing before the common council. The city shall provide at least 30 days' notice to the licensed adult family home or the community living arrangement that such a hearing will be held. At the hearing, the licensed adult family home or the community living arrangement may be represented by counsel and may present evidence and call and examine witnesses and cross-examine other witnesses called. The common council may call witnesses and may issue subpoenas. All witnesses shall be sworn by the common council. The common council shall take notes of the testimony and shall mark and preserve all exhibits. The common council may, and upon request of the licensed adult family home or the community living arrangement shall, cause the proceedings to be taken by a stenographer or by a recording device, the expense thereof to be paid by the city. Within 20 days after the hearing, the common council shall mail or deliver to the licensed adult family home or the community living arrangement its written determination stating the reasons therefor. The determination shall be a final determination.

Wis.Stat. § 62.23(7)(i).

The "community living arrangement" referenced in Subsection 62.23(7)(i)1 is defined in Subsection 46.03(22) of the Wisconsin Statutes as follows:

(22) **Community living arrangements.** (a) "Community living arrangement" means any of the following facilities licensed or operated, or permitted under the authority of the department: child welfare agencies under s. 48.60, group homes for children under s. 48.02(7) and community-based residential facilities under s. 50.01;

but does not include adult family homes, as defined in s. 50.01, day care centers, nursing homes, general hospitals, special hospitals, prisons and jails. "Community living arrangement" also includes a youth village program as described in s. 118.42.

(b) Community living arrangements shall be subject to the same building and housing ordinances, codes and regulations of the municipality or county as similar residences located in the area in which the facility is located.

(c) The department shall designate a subunit to keep records and supply information on community living arrangements under ss. 59.69(15)(f), 60.63(7)(i)6. The subunit shall be responsible for receiving all complaints regarding community living arrangements and for coordinating all necessary investigatory and disciplinary actions under the laws of this state and under the rules of the department relating to the licensing of community living arrangements.

(d) A community living arrangement with a capacity for 8 or fewer persons shall be a permissible use for purposes of any deed covenant which limits use of property to single-family or 2–family residences. A community living arrangement with a capacity for 15 or fewer persons shall be a permissible use for purposes of any deed covenant which limits use of property to more than 2–family residences. Covenants in deeds which expressly prohibit use of property for community living arrangements are void as against public policy.

(e) If a community living arrangement is required to obtain special zoning permission, as defined in s. 59.69(15)(g), the department shall, at the request of the unit of government responsible for granting the special zoning permission, inspect the proposed facility and review the program proposed for the facility. After such inspection and review, the department shall transmit to the unit, of government responsible for granting the special zoning permission a statement that the proposed facility and its proposed program have

been examined and are either approved or disapproved by the department.
Wis.Stat. § 46.03(22).

The type of community living arrangement at issue in this case is called a "community based residential facility" (CBRF) which is defined in Subsection 50.01(1g) of the Wisconsin Statutes as follows:

(1g) "Community-based residential facility" means a place where 5 or more unrelated adults reside in which care, treatment or services above the level of room and board but not including nursing care are provided to persons residing in the facility as a primary function of the facility. "Community-based residential facility" does not include any of the following:

(a) A convent or facility owned or operated by members of a religious order exclusively for the reception and care or treatment of members of that order.

(b) A facility or private home that provides care, treatment and services only for victims of domestic abuse, as defined in s. 46.95(1)(a), and their children.

(c) A shelter facility as defined under s. 16.352(1)(d).

(d) A place that provides lodging for individuals and in which all of the following conditions are met:

1. Each lodged individual is able to exit the place under emergency conditions without the assistance of another individual.

2. No lodged individual receives from the owner, manager or operator of the place or the owner's, manager's or operator's agent or employe any of the following:

a. Personal care, supervision or treatment, or management, control or supervision of prescription medications.

b. Care or services other than board, information, referral, advocacy or job guidance; location and coordination of social services by an agency that is not affiliated with the owner, manager or operator, for which arrangements were made for an individual before he or she lodged in the place; or, in the case of an emergency, arrangement for the provision of health

care or social services by an agency that is not affiliated with the owner, manager or operator.

(e) An adult family home.

(f) A residential care apartment complex.

(g) A residential facility in the village of Union Grove that was authorized to operate without a license under a final judgment entered by a court before January 1, 1982, and that continues to comply with the judgment notwithstanding the expiration of the judgment.

Wis.Stat. § 50.01(1g).

The "other" living arrangements subject to the 2500–foot spacing rule in Subsection 62.23(7)(i) are foster homes, treatment foster homes or adult family homes. A "foster home" is defined as follows:

(6) "Foster home" means any facility that is operated by a person required to be licensed by s. 48.62(1)(a) and that provides care and maintenance for no more than 4 children unless all of the children are siblings.

Wis.Stat. § 48.02(6).

A "treatment foster home" is defined as follows:

(17q) "Treatment foster home" means any facility that is operated by a person required to be licensed under s. 48.62(1)(b), that is operated under the supervision of the department, a county department or a licensed child welfare agency, and that provides to no more than 4 children care, maintenance and structured, professional treatment by trained individuals, including the treatment foster parents.

Wis.Stat. § 48.02(17q).

An "adult family home" means one of the following:

(1)(a) A private residence to which all of the following apply:

1. Care and maintenance above the level of room and board but not including nursing care are provided in the private residence by the care provider whose primary domicile is this residence for 3 or 4 adults, or more adults if all of the adults are siblings, each of whom has a developmental disability, as defined in s. 51.01(5), or, if the residence is licensed as a foster home, care and maintenance are provided to chil-

dren, the combined total of adults and children so served being no more than 4, or more adults or children if all of the adults or all of the children are siblings, or, if the residence is licensed as a treatment foster home, care and maintenance are provided to children, the combined total of adults and children so served being no more than 4.

2. The private residence was licensed under s. 48.62 as a foster home or treatment foster home for the care of the adults specified in subd. 1. at least 12 months before any of the adults attained 18 years of age.

(b) A place that meets the definition under sub. (1g), except sub. (1g)(e), and except that only 3 or 4 unrelated adults reside there.

Wis.Stat. § 50.01(1).

## B. FEDERAL

The Plaintiff contends that Subsections 62.23(7)(i)1 & 2r of the Wisconsin Statutes conflict with, and therefore are preempted by, the federal Fair Housing Amendment Act, (FHAA) and the Americans With Disabilities Act (ADA). The Plaintiff also maintains that Subsections 62.23(7)(i)1 & 2r have a discriminatory impact upon the handicapped and that the Defendants have violated the FHAA and ADA by not making the reasonable accommodations required by both Acts.

The Fair Housing Amendment Act forbids a person:

(f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter,

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—

(A) that person; or

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that person.

(3) For purposes of this subsection, discrimination includes—

(A) a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises except that, in the case of a rental, the landlord may where it is reasonable to do so condition permission for a modification on the renter agreeing to restore the interior of the premises to the condition that existed before the modification, reasonable wear and tear excepted.

(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodation may

be necessary to afford such person equal opportunity to use and enjoy a dwelling;

42 U.S.C. § 3604(f)(1)–(f)(3)(B).

Title II of the ADA prohibits a public entity from discriminating against an individual on the basis of disability or from excluding such an individual from public services, programs, or activities. Section 12132 of the ADA provides that:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

## II. *FACTS*

Oconomowoc Residential Programs, Inc. (ORP), a for-profit Wisconsin corporation, through its Homes for Independent Living division, owns and operates group homes for the developmentally disabled [3] in ten south-

---

3. ORP says that the clients it intends to serve at the Greenfield and Greendale locations are people inflicted with developmental disabilities as defined in Subsection 51.01(5) of the Wisconsin Statutes which provides that:

(5)(a) "Developmental disability" means a disability attributable to brain injury, cerebral palsy, epilepsy, autism, Prader–Willi syndrome, mental retardation or requiring treatment similar to that required for mental retardation, which has continued or can be expected to continue indefinitely and constitutes a substantial handicap to the afflicted individual. "Developmental disability" does not include senility which is primarily caused by the process of aging or the infirmities of aging.

(b) "Developmental disability", for purposes of involuntary commitment, does not include cerebral palsy or epilepsy.

Wis.Stat. § 51.01(5).

In Chapter 55 of the Wisconsin Statutes which governs the protective service system, "developmentally disabled person" is defined as follows:

(2) "Developmentally disabled person" means any individual having a disability attributable to mental retardation, cerebral palsy, epilepsy, autism or another neurological condition closely related to mental retardation or requiring treatment similar to that required for mentally retarded individuals, which has continued or can be expected to continue indefinitely, substantially impairs the individual from adequately providing for his or her own care or custody, and constitutes a substantial handicap to the afflicted individual. The term does not

include a person affected by senility which is primarily caused by the process of aging or the infirmities of aging.

Wis.Stat. § 55.01(2).

The parties agree that the proposed residents of ORP's group homes would be handicapped within the meaning of the Fair Housing Act in which:

(h) "Handicap" means, with respect to a person—

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment,

but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 802 of Title 21).

42 U.S.C. § 3602(h).

And, finally, the parties agree that the proposed residents would have "developmental disabilities" within the meaning of the Americans With Disabilities Act, which provides that:

(8) Developmental disability

The term "developmental disability" means a severe, chronic disability of an individual 5 years of age or older that—

(A) is attributable to a mental or physical impairment or combination of mental and physical impairments;

(B) is manifested before the individual attains age 22;

(C) is likely to continue indefinitely;

eastern Wisconsin counties. In 1996, ORP purchased single family houses in residential neighborhoods in the Village of Greendale and the City of Greenfield with the intention of turning them into community-based residential facilities (CBRFs) serving six or fewer developmentally disabled adults. Knowing that the homes were fewer than 2500 feet from existing group homes in those communities, ORP sought special zoning permission for waiver of the spacing requirement set forth in Subsection Wis.Stat. § 62.23(7)(i)1. At the time ORP applied for the special zoning permission, it had not developed a profile of the specific residents that would be living in the homes.

After learning that ORP intended to establish group homes in their communities, residents in Greendale and Greenfield retained an attorney to represent them before the governing bodies in opposing the CBRFs at the proposed locations. The attorney presented records compiled by various state offices containing allegations showing:

a. ORP staff physically and sexually abusing patients;

b. ORP staff providing illegal drugs to residents;

c. ORP staff "losing" a resident who was later found by police wandering in the middle of the street;

d. ORP staff leaving a resident to sleep in urine and feces;

e. long-standing gross maintenance of an ORP CBRF, where putrid water was allowed over many years; and

f. ORP attempting to cover up violations.

ORP responded to the charges by explaining that some of these incidents occurred at its homes for the mentally ill, not only at its homes for the developmentally disabled; that some complaints resulted in findings of "no violation"; that corrective action was taken; that ORP has never lost a license;[4] that police calls have decreased; and that ORP has never "lost" a developmentally disabled resident.

After holding public hearings and subjecting ORP's requests to multiple levels of review, Greenfield's Common Council denied the request for a spacing waiver for operating a CBRF at 4570 South 117th Street in the City. Greendale's Board of Trustees also held public hearings and subjected ORP's request to multiple levels of review, then denied permission to operate a CBRF at 5883 Riverside Drive in the Village. The municipalities' decisions were based on the 2500–foot spacing rule and upon concerns raised by residents and public officials.

Although the Defendants turned down ORP's requests for waivers of the 2500–foot spacing rule, the Defendants say that at least three other CBRFs are located in the Village of Greendale and that the Village had not denied any request for an exception to section 62.23(7)(i)1 before denying ORP's. At least twelve CBRFs are located in the City of Greenfield and Greenfield says that it had never denied a request for an exception to the 2500–foot spacing rule before it denied ORP's request.

### III. *LEGAL STANDARDS FOR SUMMARY JUDGMENT*

Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, affidavits, and other materials show that there is "no genuine issue as to any

(D) results in substantial functional limitations in three or more of the following areas of major life activity—
(i) self-care;
(ii) receptive and expressive language;
(iii) learning;
(iv) mobility;
(v) self-direction;
(vi) capacity of independent living; and
(vii) economic self-sufficiency; and
(E) reflects the individual's need for a combination and sequence of special, interdisciplinary, or generic services, supports, or other assistance that is of lifelong or extended duration and is individually planned and coordinat-

ed, except that such term, when applied to infants and young children means individuals from birth to age 5, inclusive, who have substantial developmental delay or specific congenital or acquired conditions with a high probability of resulting in developmental disabilities if services are not provided.
42 U.S.C.A. § 60001(8) (West.Supp.1998).

4. ORP is licensed and regulated by Defendant Wisconsin Department of Health and Family Services (DHFS). Defendant DHFS denies any involvement in the zoning application process in either municipality. *See* Affidavit of Leon R. Broman at ¶ 2.

material fact," and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c). Only genuine issues over "material facts" can prevent a grant of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Material facts" are those that might affect the outcome of the suit under the governing law. *See Id.* A "genuine issue" exists if there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. When considering a motion for summary judgment, the court must view the facts, and all reasonable inferences drawn from those facts, in the light most favorable to the nonmovant. *See Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991); *Roman v. United States Postal Service,* 821 F.2d 382, 385 (7th Cir.1987). Because the parties in this case have filed cross-motions, the court must extend the required favorable inferences to each when considering the other's motion. *See McCarthy v. Kemper Life Insurance Companies,* 924 F.2d 683, 687 (7th Cir.1991).

## IV. *POSITIONS OF THE PARTIES*

In moving for a partial summary judgment of liability, ORP argues that:

1. the "2,500–foot rule," enacted in 1977 and set forth in § 62.23(7)(i)1 of the Wisconsin Statutes, upon which the City of Greenfield and Village of Greendale relied in denying zoning exceptions requested by ORP to open small group homes, is facially discriminatory and, therefore, preempted by both the Fair Housing Act of 1968, as amended by the Fair Housing Amendment Act of 1988, and the Americans With Disabilities Act of 1990;

2. the actions by Greenfield and Greendale in denying ORP's requests for exceptions to place a community-based residential facility within 2,500 feet of an existing group home has a disparate and discriminatory impact on the developmentally disabled;

3. in their application of the 2,500–foot spacing requirement, neither Greenfield nor Greendale made any effort at "reasonable accommodation" of ORP's request for an exception to open community based residential facilities within 2,500 feet of an existing group home in each community and, in so doing, discriminated against the developmentally disabled; and

4. subsection 62.23(7)(i)1 of the Wisconsin Statutes is contrary to the express public policy of the State of Wisconsin.

ORP has omitted any arguments in support of its equal protection theory of liability or in support of its request for an injunction permanently enjoining the "defendants from interfering with the construction, management and operation of the community living arrangements at the proposed sites and from annually reviewing ORP's licensure." Complaint at ¶ B. The Plaintiff has also failed to brief its theory of liability under the ADA, which is given only passing mention in its principal brief. The Defendants suggest that the Plaintiff has "split" the issues with the Plaintiffs in a companion case. *See Vincent Z v. Village of Greendale,* No. 96–C–1101 (E.D.Wis.). Earlier in these proceedings, the court advised the parties that, because these cases have not been consolidated for any purpose, separate filings must be made in each case. *See* Order of May 12, 1997. Therefore, the court will not consider any arguments made in the other case. Because the Plaintiff agreed to resolve all issues raised in this action by means of cross motions for summary judgment, the court concludes that the Plaintiff has waived its equal protection theory and its request for an order enjoining annual review. The Plaintiff has also waived its ADA theory of liability by failing to set forth any supporting law or facts.

And finally, the court will not decide whether Subsection 62.23(7)(i)1 of the Wisconsin Statutes conflicts with "the express public policy of the State of Wisconsin." The interest of comity would not be served by this federal court making such a ruling and, even if the court did resolve the issue in the Plaintiff's favor, no relief would be available.

## V. *FACIAL INVALIDITY; PREEMPTION*

### A. FACIAL INVALIDITY

As its first ground for seeking summary judgment in its favor, ORP contends that

Subsections 62.23(7)(i)1 & 2r of the Wisconsin Statutes are "facially discriminatory and, therefore, preempted by both the FHA and FDA [sic]." Brief of Plaintiff, Oconomowoc Residential Programs, Inc., in Support of Motion for Partial Summary Judgment at 18.

■■■■ The Seventh Circuit has stated that: "a facial challenge to a legislative Act is ... the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Government Suppliers Consolidating Services, Inc. v. Bayh,* 975 F.2d 1267, 1283 (7th Cir.1992) (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)), *cert. denied,* 506 U.S. 1053, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993)). Except in the First Amendment context, facial challenges to statutes are disfavored. *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). If a statute is unlawful on its face, a state may not enforce the statute under any circumstance.

The Plaintiff here has not met its "difficult challenge" because, as the Defendants point out, Subsections 62.23(7)(i)1 & 2r do not only apply to disabled people. The law also applies to people who live in other small group homes such as foster homes and group homes for children. Therefore, the Plaintiffs have failed to establish that the law is facially invalid because it would not impact the disabled in every instance.[5]

## B. PREEMPTION

A related question is whether Subsections 62.23(7)(i)1 & 2r are preempted by the ADA or FHAA. The Plaintiff contends that any spacing requirement impacting disabled people by burdening their opportunities to live in residential neighborhoods is invalid under both federal Acts. The Seventh Circuit has summarized the test for preemption as follows:

> The Supreme Court has mandated that federal preemption questions be addressed through a two-tier inquiry. The reviewing court must first ask whether there is "such actual conflict between the two schemes or regulation that both cannot stand in the same area." *Florida Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 141, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). If such "actual conflict" is found, the inquiry is at an end. Or, as the Supreme Court has stated, "A holding of federal exclusion of state law is inescapable and *requires no inquiry into congressional design where compliance with both federal and state regulation is a physical impossibility* for one engaged in interstate commerce...." *Id.* at 142–43, 83 S.Ct. at 1217. (emphasis added). In short, the assessment of "actual" or "facial" conflict is a threshold inquiry we cannot escape; only if this inquiry is answered negatively can we entertain arguments as to the intent of Congress to occupy the field or preclude the kind of state regulation at issue. *Pacific Gas and Electric Co. v. State Energy Resources Conservation and Development Commission,* 461 U.S. 190, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983) ("Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law."); *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158, 165, 98 S.Ct. 988, 994–995, 998, 55 L.Ed.2d 179 (1978); *De-Canas v. Bica,* 424 U.S. 351, 363, 96 S.Ct. 933, 940, 47 L.Ed.2d 43 (1976); *McDermott v. Wisconsin,* 228 U.S. 115, 33 S.Ct. 431, 57 L.Ed. 754 (1913). *See also* L. Tribe, American Constitutional Law, § 6–24 at 377–78 (1978); C. Antieu, 2 Modern Constitutional Law, § 10:22 at 41–42 (1969) ("Where state rules clash with an act of Congress in the field of interstate commerce, there is no weighing by the courts of supposed state interests versus national interests. This the court presumes has been done by Congress in enacting the legislation within its constitutional power .").

*Kroog v. Mait,* 712 F.2d 1148, 1151–52 (7th Cir.1983).

---

**5.** In *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the United States Supreme Court, ruling on an abortion law, used a test under which a factual showing of unconstitutional applications in a substantial percentage of cases where the law applies, can render a law unconstitutional even if the law has constitutional applications. *Id.* at 895, 112 S.Ct. 2791. The parties have not argued that the *Casey* test should apply, so the court will adhere to the traditional *Salerno* test used in the Seventh Circuit.

The Plaintiff does not argue that the Wisconsin statute is in actual, physical conflict with the ADA and FHAA. Therefore, the court must advance to the second tier of the preemption test to determine whether Congress intended to preempt state law in this instance. Congress has not yet evinced an intent to occupy the field of municipal zoning, but it has evinced its intent that the FHAA preempt state laws to the extent that any state laws conflict with the FHAA. Section 3615 of the Fair Housing Amendment Act provides that:

> Nothing in this subchapter shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this subchapter shall be effective, that grants, guarantees, or protects the same rights as are granted by this subchapter; but any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid.

42 U.S.C. § 3615.

The ADA does not contain an explicit preemption provision, so to determine whether a state statute is preempted by the ADA and, therefore, invalid under the Supremacy Clause of the Constitution, the court must ascertain the intent of Congress. *See California Federal Savings and Loan Association v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). Congress has stated that the purpose of the ADA is:

> (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;
>
> (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
>
> (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

> (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101(b).

Consistent with the national mandate eliminating discrimination against individuals with disabilities, Section 501(b) of the ADA provides that state laws which provide greater or equal protection to individuals with disabilities are not preempted. *See* 42 U.S.C. § 12201. Section 501(c)(1) and (2) provides that state insurance laws regarding classifying, administering, and underwriting risks are not preempted as to benefit plans under the ADA. And, Section 501(c)(3) "clarifies that self-insured plans, which are currently governed by the preemption provisions of the Employment Retirement Income Security Act (ERISA), are still governed by that preemption provision and are not subject to state insurance laws." H.Rep. No. 101–485(II), at 137 U.S.Code Cong. & Admin.News 1990, at 420. Given these explicit exceptions to preemption and the statement of Congressional purpose, the court concludes that Congress intended that the ADA preempt state law with which it conflicts.

Having established that the FHAA, explicitly, and the ADA, implicitly, express Congress' intent that the Acts protecting the disabled preempt any conflicting laws, the court now turns to the question of whether Subsections 62.23(7)(i)1 & 2r of the Wisconsin Statutes are in conflict with these laws.

In deciding whether Subsections 62.23(7)(i)1 & 2r conflict with the federal Acts, a brief history is instructive. In 1977, the Wisconsin Legislature enacted Subsection 62.23(7)(i) as part of a chapter of laws setting forth the powers of Wisconsin cities. Under this chapter, cities can enact their own zoning codes under which areas can be zoned for single family residential use. Each city must define "family" for zoning purposes in its code.[6] In general, groups of unrelated

---

6. The City of Greenfield's zoning code defines "family" as:

> An individual or 2 or more persons related by blood or marriage, or a group of not more than 2 persons (excluding servants), who are

not related by blood or marriage, living together as a single housekeeping unit in a dwelling unit. Excludes religious homes.

Affidavit of Mayor Timothy A. Seider at Exhibit A, at § 21.05.

people who do not compose a family cannot live in single family residential neighborhoods without special zoning permission.

The Wisconsin Legislature accommodated disabled people who cannot live independently by enacting Subsections 62.23(7)(i)1 & 2r which limited the power of all Wisconsin cities to determine their own zoning policies by providing that every municipality in the state must allow small groups of unrelated, disabled persons to live together in single family homes in residential neighborhoods without seeking special zoning permission *unless* the proposed group home is fewer than 2500 feet from an existing group home. The purpose for this spacing requirement was explained by the Legislature as follows:

> It is the legislature's intent to promote public health, safety and welfare by enabling persons who otherwise would be institutionalized to live in normal residential settings, thus hastening their return to their own home by providing them with the supervision they need without the expense and structured environment of institutional living. To maximize its rehabilitative potential, a community living arrangement should be located in a residential area which does not include numerous other such facilities. The residents of the facilities should be able to live in a manner similar to the other residents of the area. The legislature finds that zoning ordinances should not be used to bar all community living arrangements since these arrangements resemble families in all senses of the word except for the fact that the residents might not be related.... The legislature believes these matters of statewide concern can be achieved only by establishing criteria which restrict the density of community living arrangements while limiting the types of and number of facilities which can exist in residential neighborhoods having an appropriate atmosphere for the residents, thereby preserving the established character of a neighborhood and community.

Section 1, ch. 205, Laws of 1977.

██ Although Subsections 62.23(7)(i)1 & 2r imposed the 2500–foot spacing requirement on disabled people living in small groups, they could survive an equal protection challenge in 1977, because the Legislature had enunciated a rational basis for the law. Disabled people are not a protected class under the Equal Protection Clause. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Therefore, a law which treated the disabled differently needed only a rational basis to pass constitutional muster.

██ More than a decade later, the United States Congress passed the Fair Housing Amendment Act of 1988 and the Americans With Disabilities Act of 1990. These Acts accorded disabled people the status of a protected class. *See Bangerter v. Orem City Corporation,* 46 F.3d 1491, 1503 (10th Cir. 1995). Therefore, the range of justifications for laws that conflict with provisions of these Acts is narrow. A rational basis will no longer support a law which burdens the disabled. For example, the Tenth Circuit has concluded that direct threats to public health or safety could be the only bases justifying discriminatory housing or zoning laws. *See Id.* ("exceptions to the FHAA's prohibitions on discrimination should be narrowly construed").

In the mid 1990s, to comply with federal laws affecting the disabled, Wisconsin developed a plan to transfer disabled people who could live in the community out of large institutions and into single family homes. It was at this juncture that the opportunities of some disabled people to live in small group homes in residential neighborhoods were allegedly hampered by the 2500–foot rule.

██ The legislative histories of both the FHAA and ADA are replete with statements

---

The Village of Greendale's zoning code defines "family" as:

> One person or 2 or more persons each related to the other by blood, marriage or legal adoption or a group of not more than 5 persons not all so related, together with his or their domestic servants, maintaining a common household in a dwelling unit. A family may also include foster children and foreign exchange students.

Affidavit of James F. Burns at Exhibit A, at § 17.03(2)(bd).

confirming that these remedial laws are to be construed broadly to ensure that disabled people are not denied meaningful access to housing or to public services or accommodations. For example, the legislative history of the FHAA explains that:

> [§ 3604(f) ] would also apply to state or local land use and health and safety laws, regulations, practices and decisions which discriminate against individuals with handicaps. While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities. Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities.
>
> The Committee intends that the prohibitions against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice.

H.R.Rep. No. 100–711, 100th Cong., 2d See. 24, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 2173, 2185.

 Turning to the Wisconsin spacing requirement, the court finds that the explicit terms of Subsections 62.23(7)(i)1. & 2r specifi-

cally apply to community living arrangements for groups of developmentally disabled adults. Thus, the subsections classify people on the basis of disability. The laws impose a 2500-foot spacing requirement on community living arrangements for the developmentally disabled.[7] This spacing requirement substantially limits meaningful access to housing for the developmentally disabled. Affidavit of John F. Maloney at Exhibit A. Thus, the subsections are an obstacle to the accomplishment and exclusion of the full purposes and objectives of Congress and to that extent they are preempted.[8] *See California Federal Savings and Loan Association v. Guerra*, 479 U.S. 272, 281, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) and *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

 Nothing in the record establishes that the Wisconsin spacing provision qualifies as an exemption under either law and there is nothing in the record to establish a justification for the law. There is not a scintilla of evidence that disabled people present a public health or safety threat to other residents of a community. *See Bangerter v. Orem City Corporation*, 46 F.3d 1491, 1503 (10th Cir. 1995). And, even though the State argues that the spacing requirement protects disabled people by preventing them from being resegregated into enclaves of group homes, benign intentions on the part of lawmakers cannot justify laws which discriminate against protected groups. *See International Union, United Automobile Aerospace and Agricultural Implement Workers of America, UAW v. Johnson Controls, Inc.*, 499 U.S.

---

**7.** It is irrelevant that the spacing requirement incidentally catches some groups of people without disabilities that live in supervised housing arrangements. *See Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985).

**8.** Wisconsin's intermediate appellate courts have addressed the 2500–foot spacing rule only in the context of challenges to the granting or not granting of reasonable accommodations. *See "K" Care, Inc. v. Town of Lac du Flambeau*, 181 Wis.2d 59, 510 N.W.2d 697 (Wis.Ct.App.1993) (town required to accommodate elderly by granting special exception to state statute imposing 2500–foot spacing requirement in that proposed

extra facility would not adversely affect residential character of neighborhood); *Tellurian U.C.A.N., Inc. v. Goodrich*, 178 Wis.2d 205, 504 N.W.2d 342 (Wis.Ct.App.1993) (village violated FHAA by not granting exception to spacing restriction where exception was feasible, practical, and would not entail undue burdens to the village). *See also United States v. Village of Marshall, Wisconsin*, 787 F.Supp. 872 (W.D.Wis. 1991) (village's refusal to grant exception to spacing restriction constituted discrimination under FHAA).

These interpretations do not save the offending subsections of Wis.Stat. § 62.23 from preemption.

187, 197–200, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991); *Larkin v. State of Michigan Department of Social Services,* 89 F.3d 285, 290–92 (6th Cir.1996).

## VI. *DISPARATE IMPACT*

Next, ORP argues that Subsection 62.23(7)(i)1 has a disparate impact upon the disabled in derogation of federal law. In order to prevail on this claim, the Plaintiff would have to persuade the court that Subsections 62.23(7)(i)1 & 2r are facially neutral. *See Gamble v. City of Escondido,* 104 F.3d 300, 306 (9th Cir.1997); *Bangerter v. Orem City Corporation,* 46 F.3d 1491, 1500 (10th Cir.1995); *Huntington Branch, National Association for the Advancement of Colored People v. Town of Huntington,* 844 F.2d 926, 933 (2d Cir.1988), *judgment affirmed in part on other grounds* by 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). Because the court has already ruled that Subsection 62.23(7)(i)1 is preempted by the FHAA and ADA because it is not facially neutral, the court will not address this claim.

## VII. *ACCOMMODATION*

 Finally, the court must consider whether the City of Greenfield and the Village of Greendale failed to make reasonable accommodations for ORP and its disabled clients within the meaning of the FHAA and the ADA. In making their zoning decisions, the City of Greenfield and Village of Greendale relied, in part, on the state's 2500–foot spacing law which the court has now ruled is invalid and preempted by the FHAA and ADA. The Seventh Circuit has recently affirmed its position that a municipality, acting under authorization from the state (rather than under compulsion by the state), can be held liable for state-authorized actions taken pursuant to municipal policy. *See Bethesda Lutheran Homes and Services, Inc. v. Leean,* 154 F.3d 716, 1998 WL 560236 (7th Cir. September 3, 1998).

 Under the Fair Housing Amendment Act, discrimination includes a "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford

such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). If the reasonable accommodations provision is triggered, a defendant can be required to incur "reasonable costs" to accommodate a plaintiff's handicap, "provided such accommodations do not pose an undue hardship or a substantial burden." *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 335 (2d Cir.1995).

Many reported cases under Section 3604(f)(3) involve requests for exceptions to zoning ordinances that would allow disabled people to live in residential neighborhoods. *See, e.g., United States v. California Mobile Home Park Management Company,* 107 F.3d 1374, 1381 n. 3 (9th Cir.1997) (collecting cases); *Elderhaven, Inc. v. City of Lubbock,* 98 F.3d 175, 177 (5th Cir.1996) (elderly care facility requiring special exception from single-family zoning ordinance). "In these cases the duty to accommodate is shaped by the handicap, such as the need of people with certain handicaps to live together in order to share support personnel and to reinforce each other's efforts in creating and maintaining a home." *Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293, 301–02 (2d Cir.1998). Thus, courts have held that the reasonable accommodation requirement of the FHAA can apply to zoning ordinances. *See Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096, 1103 (3d Cir.1996). *See also Bangerter v. Orem City Corporation,* 46 F.3d 1491, 1497 (10th Cir.1995).[9]

 FHAA or ADA plaintiffs have the burden of seeking an accommodation before seeking relief in a judicial forum. *See Oxford House–A v. City of University City,* 87 F.3d 1022, 1024–25 (8th Cir.1996). The Defendants in the instant case contend that ORP has not requested an accommodation; however, requesting the zoning exception under subsection 62.23(7)(i)1 meets this requirement. *See, e.g., Oxford House, Inc. v. City of Virginia Beach,* 825 F.Supp. 1251, 1260–61 (E.D.Va.1993).

 Courts are divided about whether the plaintiff or the defendant bears the bur-

---

**9.** As explained in Part V above, a plaintiff may also seek a zoning accommodation under the ADA.

den of proving whether the proposed accommodation is reasonable. *Compare Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1103 (3d Cir.1996) (holding that under FHAA defendant must prove that the plaintiff's proposed accommodation is unreasonable) *with Elderhaven., Inc. v. City of Lubbock*, 98 F.3d 175, 178 (5th Cir.1996) (plaintiff bears burden of proof under FHAA and Rehabilitation Act). The Fourth Circuit has ruled that: "Because the FHA's text evidences no intent to alter normal burdens, the plaintiff bears the burden of proving . . . [an accommodation is reasonable] by a preponderance of the evidence." *Bryant Woods, Inn v. Howard County, Maryland,* 124 F.3d 597, 603 (4th Cir.1997). In the absence of any argument to the contrary by the parties to this action, this court will follow the Fourth Circuit's position.

The term "reasonable accommodation" was defined by the Seventh Circuit in *Brandt v. Village of Chebanse*, 82 F.3d 172 (7th Cir. 1996), where Judge Easterbrook, writing for the panel, explained:

"Reasonable accommodation" is a term in many federal regulations and statutes, a term with an accepted meaning. Our recapitulation in *Vande Zande v. Wisconsin Department of Administration,* 44 F.3d 538, 542 (7th Cir.1995), an employment case, carries over nicely to housing:

It is plain enough what "accommodation" means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work. The difficult term is "reasonable." . . . To "accommodate" a disability is to make some change that will enable the disabled person to work. An unrelated, inefficacious change would not be an accommodation of the disability at all. So "reasonable" may be intended to qualify (in the sense of weaken) "accommodation," in just the same way that if one requires a "reasonable effort" of someone this means less than the maximum possible effort, or in law that the duty of "reasonable care." the cornerstone of the law of negligence, requires something less than the maximum possible care. It is understood in that law that in deciding what care is

reasonable the court considers the cost of increased care.

*See also Bronk v. Ineichen,* 54 F.3d 425, 429 (7th Cir.1995) (applying the approach of *Vande Zande* to a Fair Housing Act case); *Palatine,* 37 F.3d at 1234 ("determining whether a requested accommodation is reasonable requires, among other things, balancing the needs of the parties involved").

*Id.* at 175.

■ The FHAA requires an accommodation for persons with disabilities if the accommodation is (1) reasonable, and (2) necessary, (3) to afford disabled people equal opportunity to use and enjoy housing. *See* 42 U.S.C. § 3604(f)(3). The Fourth Circuit has defined these criteria as follows:

In determining whether the reasonableness requirement has been met, a court may consider as factors the extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations and the benefits that the accommodation would provide to the handicapped. It may also consider whether alternatives exist to accomplish the benefits more efficiently. And in measuring the effects of an accommodation, the court may look not only to its functional and administrative aspects, but also to its costs. "Reasonable accommodations" do not require accommodations which impose "undue financial and administrative burdens," *Davis,* 442 U.S. at 412, 99 S.Ct. at 2370 or "changes, adjustments, or modifications to existing programs that would be substantial, or that would constitute fundamental alterations in the nature of the program," *Alexander v. Choate,* 469 U.S. 287, 301 n. 20, 105 S.Ct. 712, 720 n. 20, 83 L.Ed.2d 661 (1985) (internal quotations omitted). Thus, for example, even though a prohibition of pets in apartments is common, facially neutral, and indeed reasonable, the FHA requires a relaxation of it to accommodate a hearing dog for a deaf person because such an accommodation does not unduly burden or fundamentally alter the nature of the apartment complex. *See Bronk v. Ineichen,* 54 F.3d 425, 429 (7th Cir.1995).

The "necessary" element—the FHA provision mandating reasonable accommodations which are necessary to afford an equal opportunity—requires the demonstration of a direct linkage between the proposed accommodation and the "equal opportunity" to be provided to the handicapped person. This requirement has attributes of a causation requirement. And if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be "necessary." *See Bronk,* 54 F.3d at 429.

And, finally, the "equal opportunity" requirement mandates not only the level of benefit that must be sought by a reasonable accommodation but also provides a limitation on what is required. The FHA does not require accommodations that increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap. As the Court in *Davis* noted, the requirement of even-handed treatment of handicapped persons does not include affirmative action by which handicapped persons would have a greater opportunity than nonhandicapped persons. *Davis,* 442 U.S. at 410–11, 99 S.Ct. at 2369. Congress only prescribed an equal opportunity. *See* 42 U.S.C. § 3604(f)(3)(B).

*Bryant Woods Inn, Inc. v. Howard County, Maryland,* 124 F.3d 597, 603 (4th Cir.1997).

▇▇▇ The first question under this test is whether the special zoning permissions sought by ORP were reasonable. The Seventh Circuit has noted that this inquiry requires a weighing of the cost to the Defendants with the benefit to the Plaintiff. *See Bronk v. Ineichen,* 54 F.3d 425, 429 (7th Cir.1995). In this case the benefit to ORP (acting as agent for potential residents of its group homes) is clear. If the special zoning permissions had been granted, groups of developmentally disabled people would have had the opportunity to live together in residential housing in the Defendant communities. Those currently housed in large state institutions would have had the benefit of a less restrictive environment.

In addition to imposing the 2500–foot spacing rule, Greenfield and Greendale officials considered the potential costs and burdens to their communities before issuing the denials.

To this end they examined records provided by an attorney retained by interested residents, as outlined in Part II, above. They also solicited views from municipal officials. The Village of Greendale's zoning code allowed it to consider the following criteria:

(a) The establishment, maintenance or operation of the special use shall not be detrimental to or endanger the public health, safety, morals, comfort or general welfare.

(b) The special use shall not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted or substantially diminish and impair property values within the neighborhood.

(c) The establishment of the special use shall not impede the normal and orderly development and improvement of the surrounding property for uses permitted in the district.

(d) Adequate utilities, access roads, drainage or other necessary site improvements have been or are being provided.

(e) Adequate measures have been or shall be taken to provide ingress and egress so designed as to minimize traffic congestion in the public streets.

(f) In allowing a special use, the Village Board may waive the bulk requirements in any district except that with respect to construction of permitted uses and expansion or major alteration of existing lawful uses and conforming buildings or structures within the Greendale Center, the Village Board may not waive the requirements as to floor area ratio contained in that district.

(g) The Village Board may require an increase in any of the provisions of the zoning district involved to provide the protection desired in pars. (a) through (e) above.

Affidavit of James P. Burns at Exhibit A, § 17.36(3).

The City of Greenfield's zoning code states that:

No application for a special use shall be granted by the Common Council unless it

finds that all of the following conditions are present:

1. That the establishment, maintenance or operation of the special use will not be detrimental or endanger the public health, safety, morals, comfort or general welfare and will not otherwise conflict with the purpose and intent of this Subchapter.

2. That the use, value and enjoyment of other property in the surrounding area for permitted uses will not be substantially impaired or diminished by the establishment, maintenance or operation of the special use.

3. That the establishment of the special use will not impede the normal and orderly development and improvement of surrounding property for permitted uses in the Zoning District and surrounding area.

4. That adequate utilities, access roads, drainage, parking and other necessary site improvements have been or are being provided.

5. That adequate measures have been or will be taken to provide ingress and egress as designated so as to minimize traffic congestion in the public streets.

6. That the special use will, except as otherwise expressly provided, conform to all applicable regulations of the Zoning District in which it is located and such other provisions of this Subchapter as might apply.

Affidavit of Mayor Timothy A. Seider at Exhibit A, § 21.07(f).

The record does not show that these municipalities considered each of these factors in arriving at their decisions. Nothing in the record reveals, for example, whether the effect on home values was a consideration. The Plaintiff accuses the municipalities of turning down its request for special zoning permission solely on the basis of the 2500–foot spacing rule. However, the record does not support this view. The communities had allowed other group homes to operate at a closer than 2500–foot proximity, but it appears that the residents were alarmed at ORP's largely unproven reputation as an undesirable group home operator.

Having examined the documents and transcripts submitted by the parties to this action, the court must conclude that most of the factors explicitly considered by Greendale and Greenfield were not proper zoning considerations. The concerns raised by the attorney for the residents were largely matters related to licensing, not zoning. Overmedicating a resident, for example, is a licensing concern, while increased traffic is a zoning concern. The few worries raised about traffic congestion or added police calls were largely speculative. Objectors produced no reports of similar problems occurring at existing group homes in either community. On the whole, the court finds that the benefit to the potential residents outweighed any relevant detriment to either community. The Plaintiff has met its burden of showing that the requested accommodations would not require a fundamental alteration in the nature of the zoning plans in either community or impose an undue financial or administrative burden on either municipality. *See Southeastern Community College v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979).

The Plaintiff has also met its burden of establishing that the accommodations were necessary. The developmentally disabled people ORP serves are not able to live independently, so the CBRF is one mode of ameliorating their inability to live independently by enabling them to live in small groups with nonresidential caretakers. *See Brandt v. Village of Chebanse, Illinois,* 82 F.3d 172, 174 (7th Cir.1996) (joint living arrangements for the disabled are essential and reasonable). For those now confined to large institutions, the CBRF presents a less restrictive environment. Maps submitted by the Plaintiff show that most of the residential areas of Greenfield and Greendale are unavailable for additional CBRFs if the 2500–foot rule is strictly applied. Thus, the spacing requirement effectively prevents additional disabled adults who cannot live independently from living in residential neighborhoods in either community.

Finally, the Plaintiff has met its burden of showing that, without the reasonable accommodation it was seeking from Greenfield and

Greendale, developmentally disabled people do not have an equal opportunity to live in single family neighborhoods in those communities. Obviously, requiring the developmentally disabled who must live in congregate arrangements to live at least 2500 feet from another such living arrangement severely limits the choice of residences for the disabled. *See City of Edmonds v. Washington State Building Code Council*, 18 F.3d 802, 806 (9th Cir.1994), *aff'd*, 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) ("Congress intended the FHAA to protect the right of handicapped persons to live in the residence of their choice in the community").

Having prevailed on all three factors of the reasonable accommodation test, ORP is entitled to judgment as a matter of law on the ground that the City of Greenfield and the Village of Greendale failed to grant reasonable accommodations as required by the FHAA. Therefore, the Defendants are liable to the Plaintiff for any damages available under that statute.

## ORDER

For the reasons explained above, the court ORDERS that the "Village of Greendale and City of Greenfield's Motion for Summary Judgment" (filed May 14, 1997) IS DENIED.

IT IS FURTHER ORDERED that the Plaintiff's "Motion for Partial Summary Judgment" (filed April 25, 1997) IS GRANTED IN PART AND DENIED IN PART. Summary judgment is granted in favor of the Plaintiff on the issue of liability. Judgment is denied with prejudice on the Plaintiff's request for an order permanently enjoining the Defendants from reviewing its licensure.

IT IS FURTHER ORDERED that the court will hold a telephonic scheduling conference on October 21, 1998 at 8:45 a.m. for the purpose of scheduling this matter for a trial on damages. The court will not consider awarding attorney fees for the damages portion of this proceeding because the Plaintiff violated the scheduling order by not moving to dispose of this entire case on summary judgment thereby unnecessarily multiplying these proceedings.